LEHMAN, Justice.
 

 [¶1] Dorian Fox (Fox) and The Investment Center, Inc. (TIC) appeal the district court's denial of their motion to dismiss Frank and Maureen Tanner's (the Tanners) allegations contained within the complaint.
 
 [1]
 
 The district court concluded that 1) a court, rather than an arbitrator, should decide the threshold question of fraudulent inducement, and 2) the underlying contracts, which included arbitration agreements, were obtained through fraud. Upon our review, we affirm.
 

 ISSUES
 

 [T2] Fox and TIC set forth the following issues on appeal:
 

 1. Whether the district court erred in denying appellants' motion to stay proceedings and compel arbitration?
 

 2. Whether the district court erred in concluding that appellees' claims of fraudulent inducement were not arbitrable under Prima Paint Corp. v. Flood & Conklin Mfg., [888 U.S. 895,] 87 S.Ct. 1801, [18 L.Ed.2d 1270] (1967), and its progeny?
 

 3. Whether the district court erred in finding that appellees' written agreement to arbitrate "all controversies or disputes" with TIC was procured through fraud and therefore unenforceable?
 

 The Tanners phrase the issues as:
 

 1. Whether the district court erred in denying appellants' motion to stay proceedings to compel arbitration?
 

 2. Whether there are other reasons appearing in the record to affirm the district court's decision? -
 

 3. Whether this matter should be dismissed for lack of appealable order?
 

 FACTS
 

 [¶3] On April 16, 2001, the Tanners, Patricia Clark O'Hearn, and Barry Fitzgerald filed a complaint against Jeffrey Barber (Barber), Fox, and TIC alleging fraud, breach of contract, and negligence.
 
 [2]
 
 In essence, the appellees allege they gave monies to Barber for investment purposes while Barber was employed as a stockbroker at TIC's Casper, Wyoming office, which Fox supervised. After they did so, Barber converted the monies for his own purposes. Fox and TIC denied they had any relationship with the Tanners whatsoever.
 

 [¶4] Nevertheless, on June 25, 1999, Barber pled guilty to four counts of fraud, including that he had unlawfully obtained property from the Tanners. In 1999, the Wyoming Secretary of State launched an investigation into TIC's activities. Ultimately, the Secretary of State entered a Final Order including factual findings that TIC had failed to reasonably supervise Barber in its Casper office. During this proceeding, TIC also entered into an Offer of Settlement admitting that it had failed to reasonably supervise Barber in its Casper office. However, in both these documents, TIC explicitly neither admitted nor denied any liability for Barber's actions.
 

 [¶5] During discovery in this action, the Tanners produced four separate Cash Ac
 
 *937
 
 count Agreement forms, which they had signed apparently at Barber's request in February of 1998. Each of these forms contain the following language:
 

 e Arbitration is final and binding on the parties.
 

 @The parties are waiving their right to seek remedies in court, including the right to jury trial.
 

 [[Image here]]
 

 Arbitration-All controversies or disputes between us of any kind shall be settled by arbitration. Without limiting the foregoing, this arbitration agreement specifically applies to all controversies or disputes arising out of or relating to (1) any aspect of this account or any other account in which I now or in the future have or in the past had an interest; (2) transactions entered into prior, on, or subsequent to the date of this agreement; and (8) the construction, performance, or alleged breach of this or any other agreement entered into between us at any time.... The award of the arbitrators, or the majority of them, shall be final, and judgment upon the award rendered may be entered in any court, state, or federal, having jurisdiction. I consent to the jurisdiction of the state and federal courts in the City of New York for the purpose of compelling arbitration, staying litigation pending arbitration, and enforcing any award of arbitrators.
 

 In addition, just before the signature blocks on each of the forms, the following language appeared: "This agreement contains a pre-dispute arbitration clause at page 1 at paragraph 10."
 

 [¶6] The forms were not signed by anyone other than the Tanners, although "The Investment Center, Inc." was printed at the top of each form next to a logo. TIC's name and its New Jersey address also appeared on the forms immediately following the signature lines. However, boxes on the forms designated for "Branch," "Account No.," and "For Office Use Only" were left blank.
 

 [¶7] On September 28, 2002, Fox and TIC filed their motion arguing that, based upon the arbitration language contained within the Cash Account Agreement forms, the Tanners' claims should be dismissed. The Tanners responded to the motion with arguments that 1) dismissal was not a proper remedy, 2) Fox and TIC had previously denied the existence of any contracts between the parties, and 3) under Wyoming law any contract that may exist between the parties may be revoked on the basis of fraud. In reply, Fox and TIC, in part, asserted that the Tanners had failed to raise a claim that they were fraudulently induced to agree to the arbitration provision. Finally, the Tanners submitted additional materials to the district court, including 1) a letter from TIC}, enclosing a copy of the Secretary of State's Final Order, and advising the plaintiffs that they could make a claim for arbitration and a demand for settlement, 2) TIC's response to a subpoena in the Wyoming Secretary of State proceeding, and 8) responses of Fox and TIC to the plaintiffs' interrogatories. Generally, the Tanners argued that the additional documentation showed that TIC had admitted to not properly supervising Barber, including his dealings with the Tanners, but that TIC still denied a formal customer relationship with the Tanners.
 

 [¶8] On March 20, 2008, the district court sent its initial decision letter to the parties. The letter indicated that after substantial review and analysis, the district court could not decide whether the Tanners' claims were arbitrable without holding a hearing to receive additional evidence concerning the agreements. Therefore, a hearing on the matter was set for July 18, 2008.
 

 [¶9] Prior to hearing, the Tanners filed a brief partially arguing that Barber, Fox, and TIC were precluded from denying liability to the Tanners by the doctrine of collateral estoppel. The Tanners arguments were based on Barber's guilty plea to criminal charges involving the Tanners and the Secretary of State's conclusions that TIC failed to properly supervise Barber. In response, Fox and Ralph J. DeVito, President of TIC, filed certified statements stating that neither Fox nor TIC had admitted to any lability in reaching settlement in the Secretary of State proceeding. In addition, Fox and TIC filed a memorandum opposing the Tanners' collateral estoppel arguments and submitted the deposition transcripts of both the Tanners
 
 *938
 
 whereby the Tanners indicated that they had not been fraudulently induced to execute the agreements. The Tanners then filed their reply and asserted for the first time that no consideration existed for the agreements.
 

 [¶10] Following the evidentiary hearing, the district court issued another lengthy decision letter. After noting the unsettled and conflicting state of the law in the area, the district court concluded that the trend was toward requiring arbitration only when the parties clearly agreed to do so. The district court then ruled that because Barber had admitted that he obtained money from the Tanners fraudulently, it strained credulity that the Tanners would have contemplated or agreed to arbitrate any dispute that arose under the agreements. Later, in another decision letter, the district court clarified that it found that paragraph 9 of the Settlement Offer in the Secretary of State proceeding admitting that TIC failed to reasonably supervise Barber in its Casper office was not only binding on TIC but also on Fox. Therefore, the district court denied the motion of Fox and TIC. This appeal followed.
 

 STANDARD OF REVIEW
 

 [¶11] When a matter has been the subject of an evidentiary hearing before the district court, we review the factual determinations under a clearly erroneous standard and the legal conclusions de novo. Odhinn v. State, 2003 WY 169, ¶ 13, 82 P.3d 715, ¶ 13 (Wyo.2003) (citing Umion Pacific Railroad v. Trona Valley Fed. Credit Union, 2002 WY 165, ¶ 7, 57 P.3d 1203, ¶ 7 (Wyo.2002)).
 

 DISCUSSION
 

 Dismissal for Lack of an Appealable Order
 

 [¶12] During the appeal process, the Tanners filed a motion to dismiss with this court. This court denied the motion, without prejudice, allowing the Tanners to again address the issue in their appellate brief. The Tanners now assert that, pursuant to W.R.A.P. 1.05, Fox and TIC have failed to appeal from a final appealable order. The Tanners argue that the order appealed is an interlocutory order to which an application for a petition for writ of review under W.R.A.P. 18 applies. Hence, the Tanners claim that because Fox and TIC failed to follow the procedural rules and requirements for a petition for a writ of review, this appeal should be dismissed.
 

 [¶13] Wyo. Stat. Ann. § 1-86-119 (Lex-isNexis 2008) (emphasis added), which is a part of Wyoming's Uniform Arbitration Act, specifies:
 

 (a) An appeal may be taken from:
 

 (i) An order denying the application to compel arbitration; R
 

 (i) An order granting an application to stay arbitration;
 

 (i) An order confirming or denying confirmation of an award;
 

 (iv) An order modifying or correcting an award;
 

 {(v) An order vacating an award without directing a rehearing; or
 

 (vi) A final judgment or decree entered by the court.
 

 (b) The appeal shall be taken in the manner of a civil action.
 

 Our rules of appellate procedure contain no explicit procedure for appealing a denial of an application to compel arbitration. Additionally, this court has previously allowed a direct appeal from an order denying a motion to stay proceedings and compel arbitration in the case of Jackson State Bank v. Homar, 837 P.2d 1081 (Wyo.1992). Therefore, given the clear language contained within Wyo. Stat. § 1-86-119, the lack of any specific procedural direction for appellate review of a denial of an application to compel arbitration, and our own case precedent, we do not find the Tanners' argument to be persuasive.
 

 Arbitrability
 

 [T14] Fox and TIC contend that the district court erred when it concluded that the Tanners' claims were not arbitrable. Specifically, Fox and TIC argue that the district court had limited discretion when presented with an application to compel arbitration pursuant to Wyo. Stat. Ann. § 1-86-104(a) (Lex-isNexis 2008). Section 1-86-104(a) provides:
 

 Duty of court on application of party to arbitrate.
 

 
 *939
 
 (a) On application of a party showing an arbitration agreement and the opposing party's refusal to arbitrate, the court shall order the parties to proceed with arbitration. If the opposing party denies the existence of the agreement to arbitrate, the court shall proceed summarily to determine the issue raised and shall order or deny arbitration accordingly.
 

 Fox and TIC also heavily rely on the case of Jackson State Bank v. Homar, 837 P.2d at 1085 and 1088, wherein we stated that the right to submit a dispute to arbitration is contractual; and, although no party is required to arbitrate a dispute unless the parties have bargained for this procedure as a method of resolve, a party should not be required to litigate disputes which are subject to an arbitration agreement. In addition, we stated, at 1086, that arbitration is strongly embedded in the public policy of this state and is favored by this court as a voluntary method to settle disputes in an inexpensive and expeditious manner without resort to strict rules of law and the rigid formality of a tribunal. Fox and TIC additionally assert that Wyoming public policy favoring arbitration mirrors the policy of federal law evidenced through enactment of the Federal Arbitration Act (FAA), 9 U.S.C. § 1, et seq., and subsequent federal case law authority interpreting the FAA. Fox and TIC also contend that the FAA preempts conflicting state law, and state courts are bound to follow its substantive provisions.
 

 [¶15] Thus, Fox and TIC conclude that because the Tanners do not assert a claim of fraud in the inducement that specifically addresses the arbitration provision, itself, this matter should have been sent to arbitration pursuant to Prima Paint Corp. v. Flood & Conklin Mfg. Co., 388 U.S. 395, 87 S.Ct. 1801, 18 LEd.2d 1270 (1967) (under the FAA, a general attack on a contract on the ground of fraud in the inducement is a sever-able claim that is referable to arbitration; only a claim of fraud in the inducement that is addressed to the arbitration provision, itself. should be adjudicated by the court rather than by an arbitrator). Finally, Fox and TIC claim that the case of Spahr v. Secco, 330 F.3d 1266, 1272-73 (10th Cir.2003), highlighted the continued vitality of the holding in Prima Paint, when it stated:
 

 As noted, Prima Paint submits to arbitrators the resolution of a claim of fraud in the inducement of the entire contract, as contrasted with a claim of fraud in the inducement of the arbitration agreement itself. Because the latter claim involves the "making" of an agreement to arbitrate under $ 4 [lof the FAA), it is for the court to resolve. 8388 U.S. [at] 408-04 [87 S.Ct. 1801]. Courts may apply this rule with ease when a party challenges a contract on the basis that it was induced by fraud because it is conceivable either that (1) he or she was fraudulently induced to agree to a contract containing an arbitration agreement; or (2) he or she was fraudulently induced to agree to the arbitration provision in particular.
 

 [¶16] In response to these arguments, the Tanners rely upon the reasoning used by the district court in reaching its decision. They contend that the district court was correct in noting that while the law in the area is unsettled, the "separability doctrine" espoused by Prima Paint has been modified by subsequent United States Supreme Court rulings and has been narrowly construed by the 10th Circuit Court of Appeals. First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995), Doctor's Associates, Inc. v. Casarotto, 517 U.S. 681, 116 S.Ct. 1652, 134 L.Ed.2d 902 (1996), Howsam v. Dean Witter Reynolds, Inc., 537 U.S. 79, 123 S.Ct. 588, 154 L.Ed.2d 491 (2002), and Spahr v. Secco. Essentially, the Tanners concur with the district court's assessment that these later authorities stand for the proposition that 1) courts may apply state law to determine the validity of the contract that contains an arbitration clause, provided that the court applies contract principles that apply to all contracts, and 2) an agreement to arbitrate may not be based upon implied consent, but only on a clear and unmistakable consent to arbitrate.
 

 [¶17] Accordingly, the Tanners argue that the district court appropriately applied established Wyoming contract law that fraud will vitiate a contract, Kendrick v. Barker, 2001 WY 2, ¶ 18, 15 P.3d 784, ¶ 18 (Wyo.
 
 *940
 
 2001), and Snyder v. Lovercheck, 992 P.2d 1079, 1086 (Wyo.1999), in denying the motion of Fox and TIC because Barber's fraud, which must be imputed to both Fox and TIC, provides a basis for not enforcing the agreements as they pertain to the Tanners' claims. Additionally, the Tanners argue that the district court made a proper alternative finding that even if Barber's fraud was not imputed to Fox and TIC, then the agreements to arbitrate could not be used by them to force arbitration because Fox and TIC had 1) denied knowledge of the Tanners, 2) stated that Barber had no authority to enter into any agreement on their behalf, 8) TIC never opened an account under the agreements, and 4) Fox and TIC never signed the agreements. Finally, the Tanners contend that the district court appropriately determined that it should determine the fraud related issues because it was not clear that the Tanners had agreed to arbitrate the arbitrability issue.
 

 [¶18] Upon our independent review, we affirm the district court's denial of the motion of Fox and TIC. Initially, we recognize that the Court in First Options explicitly stated:
 

 When deciding whether the parties agreed to arbitrate a certain matter (including arbitrability), courts generally (though with a qualification we discuss below) should apply ordinary state-law principles that govern the formation of contracts.
 

 First Options, 514 U.S. at 944, 115 S.Ct. at 1924, 131 L.Ed.2d at 993. The United States Supreme Court later clarified this rule of law in Doctor's Associates, Inc. Therein, the Court stated at 517 U.S. at 686-87, 116 S.Ct. at 1656, 134 LEd.2d at 908-09 (emphasis added):
 

 Section 2 of the FAA provides that written arbitration agreements "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2 (emphasis added). Repeating our observation in Perry [v. Thomas, 482 U.S. 483, 107 S.Ct. 2520, 96 LEd.2d 426 (1987) ], the text of § 2 declares that state law may be applied "if that law arose to govern issues concerning the validity, revo-cability, and enforceability of contracts generally." 482 U.S. at 498, n. 9 [107 S.Ct. 2520]. Thus, generally applicable contract defenses, such as fraud, duress, or unconscionability, may be applied to invalidate arbitration agreements without contravening § 2. See Allied-Bruce [Terminix Cos. v. Dobson ], 513 U.S. [265,] at 281, [115 S.Ct. 834, 130 LEd.2d 753 (1995) ]; Rodriguez de Quijas v. Shearson/American Express, Inc., 490 U.S. 477, 483-484, 109 S.Ct. 1917, 104 L.Ed.2d 526 (1989); Shearson/American Express Inc. v. McMahon, 482 U.S. 220, 226, 107 S.Ct. 2332, 96 L.Ed.2d 185 (1987).
 

 Courts may not, however, invalidate arbitration agreements under state laws applicable only to arbitration provisions. See Allied-Bruce, 513 U.S. at 281 [115 S.Ct. 834]; Perry, 482 U.S. at 493, n. 9 [107 S.Ct. 2520]. By enacting § 2, we have several times said, Congress precluded States from singling out arbitration provisions for suspect status, requiring instead that such provisions be placed "upon the same footing as other contracts." Scherk v. Alberto-Culver Co., 417 U.S. 506, 511, 94 S.Ct. 2449, 41 L.Ed.2d 270 (1974) (internal quotation marks omitted).
 

 [T19] It is well established under Wyoming general contract law, which applies to all contracts, that fraad will vitiate a contract. Kendrick v. Barker, ¶ 18; Snyder v. Lovercheck, 992 P.2d at 1086. It is undisputed that the Tanners allege that fraud occurred with respect to their interactions with Barber.
 

 [¶20] We conclude that the case of First Options also stands for the proposition that the waiver of access to the courts through an agreement to arbitrate may not be based upon implied consent, but only on a clear and unmistakable consent to arbitrate. Thus, in the First Options case, the United States Supreme Court upheld the court of appeals' determination that the dispute in that case was not arbitrable because the involved couple had not clearly agreed to submit the question of arbitrability to arbitration. In doing so, the Court stated:
 

 
 *941
 
 This Court, however, has (as we just said) added an important qualification, applicable when courts decide whether a party has agreed that arbitrators should decide arbitrability: Courts should not assume that the parties agreed to arbitrate arbitrability unless there is "clear and unmistakable" evidence that they did so. AT & T Technologies [, Inc. v. Communications Workers, 475 U.S. 643], at 649 [, 106 S.Ct. 1415, 89 L.Ed.2d 648 (1986) ]; see [Steelworkers v.] Warrior & Gulf [Nav. Co., 363 U.S. 574], at 583, n. 7, [80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960) ]. In this manner the law treats silence or ambiguity about the question "who (primarily) should decide arbitrability" differently from the way it treats silence or ambiguity about the question "whether a particular merits-related dispute is arbitrable because it is within the seope of a valid arbitration agreement"-for in respect to this latter question the law reverses the presumption. See Mitsubishi Motors [Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614], at 626 [, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985) ] (" '[AJny doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration' ") (quoting Moses H. Cone Memorial Hospital v. Mercury Constr. Corp., 460 U.S. 1, 24-25, 103 S.Ct. 927, 74 LEd.2d 765 (1988); Warrior & Gulf, supra, at 582-583 [80 S.Ct. 1347].
 

 But, this difference in treatment is understandable. The latter question arises when the parties have a contract that provides for arbitration of some issues. In such cireumstances, the parties likely gave at least some thought to the seope of arbitration. And, given the law's permissive policies in respect to arbitration, see, e.g., Mitsubishi Motors, supra, at 626 [105 S.Ct. 3346], one can understand why the law would insist upon clarity before concluding that the parties did nof want to arbitrate a related matter. See [G. Wil-ner, 1] Domke [on Commercial Arbitration}, § 12.02, p. 156 [ (1993) ] (issues will be deemed arbitrable "unless it is clear that the arbitration clause has not included" them). On the other hand, the former question-the "who (primarily) should decide arbitrability" question-is rather arcane. A party often might not foeus upon that question or upon the significance of having arbitrators decide the seope of their own powers. Cf. Cox, Reflections Upon Labor Arbitration, 72 Harv. L.Rev. 1482, 1508-1509 (1959), cited in Warrior & Gulf, 363 U.S. at 583, n. 7 [80 S.Ct. 1347]. And, given the principle that a party can be forced to arbitrate only those issues it specifically has agreed to submit to arbitration, one can understand why courts might hesitate to interpret silence or ambiguity on the "who should decide arbitrability" point as giving the arbitrators that power, for doing so might too often force unwilling parties to arbitrate a matter they reasonably would have thought a judge, not an arbitrator, would decide. Ibid. See generally Dean Witter Reynolds Inc. v. Byrd, 470 U.S. 213, 219-220, 105 S.Ct. 1238, 84 L.Ed.2d 158 (1985) (Arbitration Act's basic purpose is to "ensure judicial enforcement of privately made agreements to arbitrate").
 

 [[Image here]]
 

 We conclude that, because the Kaplans did not clearly agree to submit the question of arbitrability to arbitration, the Court of Appeals was correct in finding that the arbitrability of the Kaplan/First Options dispute was subject to independent review by the courts
 

 First Options, 514 U.S. at 944-47, 115 S.Ct. at 1924-25, 131 L.Ed.2d at 994-95 (emphasis added). The United States Supreme Court subsequently expounded on this position in Howsam:
 

 This Court has determined that "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." Steelworkers v. Warrior & Gulf Nav. Co., 363 U.S. 574, 582, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960); see also First Options, 514 U.S. at 942-943 [115 S.Ct. 1920]. Although the Court has also long recognized and enforced a "liberal federal policy favoring arbitration agreements," Moses H. Cone Memorial Hospital v. Mercury Constr. Corp., 460 U.S. 1, 24-25, 103 S.Ct. 927, 74 LEd.2d
 
 *942
 
 765 (1983), it has made clear that there is an exception to this policy: The question whether the parties have submitted a particular dispute to arbitration, i.e., the "question of arbitrability," is "an issue for judicial determination unless the parties clearly and unmistakably provide otherwise." AT & T Technologies, Inc. v. Communications Workers, 475 U.S. 643, 649, 106 S.Ct. 1415, 89 L.Ed.2d 648 (1986) (emphasis added); First Options, 514 U.S. at 944 [115 S.Ct. 1920]. ...
 

 Linguistically speaking, one might call any potentially dispositive gateway question a "question of arbitrability," for its answer will determine whether the underlying controversy will proceed to arbitration on the merits. The Court's case law, however, makes clear that, for purposes of applying the interpretive rule, the phrase "question of arbitrability" has a far more limited scope. See 514 U.S. at 942 [115 S.Ct. 1920]. The Court has found the phrase applicable in the kind of narrow circumstance where contracting parties would likely have expected a court to have decided the gateway matter, where they are not likely to have thought that they had agreed that an arbitrator would do so, and, consequently, where reference of the gateway dispute to the court avoids the risk of forcing parties to arbitrate a matter that they may well not have agreed to arbitrate.
 

 Thus, a gateway dispute about whether the parties are bound by a given arbitration clause raises a "question of arbi-trability" for a court to decide. See id., at 948-946 [115 S.Ct. 1920] (holding that a court should decide whether the arbitration contract bound parties who did not sign the agreement); John Wiley & Sons, Inc. v. Livingston, 376 U.S. 543, 546-547, 84 S.Ct. 909, 11 L.Ed.2d 898 (1964) (holding that a court should decide whether an arbitration agreement survived a corporate merger and bound the resulting corporation). Similarly, a disagreement about whether an arbitration clause in a con-cededly binding contract applies to a particular type of controversy is for the court. See, eg., AT & T Technologies, supra, 475 U.S. 643, at 651-652 [106 S.Ct. 1415] (holding that a court should decide whether a labor-management layoff controversy falls within the arbitration clause of a collective-bargaining agreement); Atkinson v. Sinclair Refining Co., 370 U.S. 238, 241-243, 82 S.Ct. 1318, 8 LEd.2d 462 (1962) (holding that a court should decide whether a clause providing for arbitration of various "grievances" covers claims for damages for breach of a no-strike agreement).
 

 At the same time the Court has found the phrase "question of arbitrability" not applicable in other kinds of general circumstance where parties would likely expect that an arbitrator would decide the gateway matter. Thus " 'procedural' questions which grow out of the dispute and bear on its final disposition" are presumptively not for the judge, but for an arbitrator, to decide. John Wiley, supra, 376 U.S. 543, at 557 [84 S.Ct. 909] (holding that an arbitrator should decide whether the first two steps of a grievance procedure were completed, where these steps are prerequisites to arbitration). So, too, the presumption is that the arbitrator should decide "allegations of waiver, delay, or a like defense to arbitrability." Moses H. Cone Memorial Hospital, 460 U.S. at 24-25 [103 S.Ct. 927]. Indeed, the Revised Uniform Arbitration Act of 2000 (RUAA), seeking to "incorporate the holdings of the vast majority of state courts and the law that has developed under the [Federal Arbitration Act]," states that an "arbitrator shall decide whether a condition precedent to arbitrability has been fulfilled." RUAA § 6(c) and comment 2, 7 UL.A. 12183 (Supp.2002). And the comments add that "in the absence of an agreement to the contrary, issues of substantive arbitrability . are for a court to decide and issues of procedural arbitrability, i.e., whether prerequisites such as time limits, notice, lach-es, estoppel, and other conditions precedent to an obligation to arbitrate have been met, are for the arbitrators to decide." Id., § 6, comment 2, 7 U.L.A., at 18 (emphasis added).
 

 Howsam, 537 U.S. at 83-85, 123 S.Ct. at 591-92, 154 L.Ed.2d at 496-98 (emphasis added).
 

 
 *943
 
 [¶21] Moreover, at least one legal scholar agrees with this analysis. Richard C. Reuben, First Options, Consent to Arbitration, and the Demise of Separability: Restoring Access to Justice for Contracts with Arbitration Provisions, 56 S.M.U. L.Rev. 819 (2008) (hereinafter Reuben). In trying to rationalize the tension between the holding in Prima Paint, on the one hand, and the holdings of First Options and Howsam, on the other, Reuben remarks:
 

 First Options explicitly rejects implied consent and its underlying rationale of efficiency, and instead insists on a "clear and unmistakable" intent to arbitrate in the contract issue. Howsam provides further evidence that the Court is moving toward a posture of some form of actual consent. While a more explicit statement from the Court would be helpful, lower courts should be mindful of this trajectory and proceed accordingly.
 

 Reuben, at 878-74 (footnote omitted). Reuben continues at 875-76 (footnotes omitted and emphasis added):
 

 [The Court's unanimous opinions in both First Options and Howsam were grounded in the need for the law to support the parties' expectations and to prevent the possibility that a court "might too often force unwilling parties to arbitrate a matter they reasonably would have thought a judge, and not an arbitrator would decide." Such reasoning leads logically only to one conclusion: that courts should decide the validity of the container contracts, unless the parties clearly and unmistakably agree to allocate that function to the arbitrator. Indeed, it borders on the absurd to suggest that a court troubled by such concerns would endorse a rule compelling into arbitration a party to a legally enforceable contract merely because of the presence of an arbitration provision in the otherwise unenforceable contract.
 

 Reuben then concludes:
 

 More recently, the Court appears to be moving toward a different approach; one emphasizing actual rather than implied consent, by insisting in First Options and Howsam that questions about whether parties have agreed to arbitrate are to be decided by courts, unless the parties clearly and unmistakably waive that right. The tension between these two case [Prima Paint and First Options | is palpable, and calls for a determination by the Supreme Court as to which will prevail. The better view, the view supported by the text and legislative history of the Federal Arbitration Act, the view that enhances rather than diminishes rule of law values, the view that appears to be supported by all nine members of the current U.S. Supreme Court, is that First Options should prevail. Carefully implemented to preserve arbitral competence-competence,[
 
 3
 
 ] such a development would simplify and clarify this unnecessarily complicated area of law, assure the jurisdictional autonomy of arbitrators, fulfill rather than defeat the reasonable expectations of parties in arbitration, return the doctrine to the clear legislative intent of the FAA, and, in the end, restore access to justice for contracts with arbitration clauses.
 

 Reuben, at 883.
 

 [¶22] Finally, while Fox and TIC accurately quote the court in Spahr v. Secco, 330 F.3d 1266, 1273 (10th Cir.20083), that case continues to explain the concept of arbitrability. A careful reading of that case evidences that the court emphasized the holding in First Options, that there can be no assumption of arbitrability and there must be a clear and unmistakable showing that the parties intended to arbitrate the issue of arbitrability. Further, a broad arbitration provision does not provide, in and of itself, evidence of the parties' intentions. Spahr, at 1270. Spahr also draws a distinction between a challenge concerning the entire contract and a challenge to the arbitration clause within the contract. The court stated:
 

 
 *944
 
 In Prima Paint, the Supreme Court held that, in the context of a fraud in the inducement challenge, the "making" of an agreement for arbitration is at issue when there is an independent challenge to the arbitration clause itself. 388 U.S. at 403-04 [87 S.Ct. 1801]. In that case, the parties entered into a consulting contract that included a promise to arbitrate any controversy arising out of the contract. When one party sued to have the overall contract rescinded, alleging fraud in the inducement, the other party brought a motion in district court to stay the proceedings and compel arbitration. Affirming the district court's grant of a stay pending arbitration, the Second Cireuit held that the "claim of fraud in the inducement of the contract generally-as opposed to the arbitration clause itself-is for the arbitrators and not the courts." Id. at 400 [87 S.Ct. 1801]. "Except where the parties otherwise intend[,] arbitration clauses as a matter of law are 'separable' from the contracts in which they are embedded, and ... where no claim is made that fraud was directed to the arbitration clause itself, a broad arbitration clause will be held to encompass arbitration of the claim that the contract itself was induced by fraud," held the See-ond Circuit Id. at 402 [87 S.Ct. 1801].
 

 Resolving a split among circuits, the Supreme Court held that a fraudulent inducement claim that goes to the entire contract must be resolved by an arbitrator. It concluded that § 4 of the FAA, which divests the court of jurisdiction "upon being satisfied that the making of the agreement for arbitration ... is not in issue," provided the answer. Id. at 408 [87 S.Ct. 1801]. "[If the claim is fraud in the inducement of the arbitration clause itself-an issue which goes to the 'making' of the agreement to arbitrate-the federal court may proceed to adjudicate it. But the statutory language does not permit the federal court to consider claims of fraud in the inducement of the contract generally." Id. at 404 [87 S.Ct. 1801].
 

 U.S. Bancorp argues that because Spahr's mental incompetence claim challenges the Cash Account Agreement generally, rather than the arbitration provision in particular, the district court should have stayed its proceedings and directed arbitration of that dispute under Prima Paint. While we have not considered the seope of Prima Paint's applicability beyond claims of fraud in the inducement, other cireuits have had occasion to do so. See, e.g., Primerica Life Ins. Co. v. Brown, 304 F.3d 469, 472-73 (5th Cir.2002) (holding that the arbitrator is to decide a mental capacity defense that does not specifically relate to the arbitration agreement); Jeske v. Brooks, 875 F.2d 71, 75 (4th Cir.1989) (holding that unconscionability and lack-of-consideration defenses challenging the entire contract, rather than the arbitration clause itself, are for the arbitrator to decide); Unionmutual Stock Life Ins. Co. v. Beneficial Life Ins. Co., 774 F.2d 524, 529 (Ist Cir.1985) (same with mutual mistake and frustration of purpose); Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Haydu, 637 F.2d 391, 398 (5th Cir.1981) (same with duress and unconscionability); Commonwealth Edison Co. v. Gulf Oil Corp., 541 F.2d 1263, 1271 (7th Cir.1976) (same with frustration of performance). In Unionmutual, the First Circuit concluded that "[the teaching of Prima Paint is that a federal court must not remove from the arbitrators consideration of a substantive challenge to a contract unless there has been an independent challenge to the making of the arbitration clause itself. The basis of the underlying challenge to the contract does not alter the ... principle." 774 F.2d at 529.
 

 In Primerica, the Fifth Cireuit recently concluded that a mental capacity defense to a contract that contains an arbitration clause is "part of the underlying dispute between the parties," and must be submitted to the arbitrator. 304 F.3d at 472. Relying on Prima Paint, the court held that "unless a defense relates specifically to the arbitration agreement, it must be submitted to the arbitrator as part of the underlying dispute." Id. We disagree, and hold that the rule announced in Prima Paint does not extend to a case where a party challenges a contract on the basis
 
 *945
 
 that the party lacked the mental capacity to enter into a contract.
 

 As noted, Prima Paint submits to arbitrators the resolution of a claim of fraud in the inducement of the entire contract, as contrasted with a claim of fraud in the inducement of the arbitration agreement itself. Because the latter claim involves the "making" of an agreement to arbitrate under § 4, it is for the court to resolve. 388 U.S. at 408-04 [87 S.Ct. 1801]. Courts may apply this rule with ease when a party challenges a contract on the basis that it was induced by fraud because it is conceivable either that (1) he or she was fraudulently induced to agree to a contract containing an arbitration agreement; or (2) he or she was fraudulently induced to agree to the arbitration provision in particular. We eannot say the same when a party raises a mental capacity challenge, as it would be odd indeed if a party claimed that its mental incapacity specifically affected the agreement to arbitrate. We conclude, therefore, that the analytical formula developed in Prima Paint cannot be applied with precision when a party contends that an entire contract containing an arbitration provision is unenforceable because he or she lacked the mental capacity to enter into the contract. Unlike a claim of fraud in the inducement, which can be directed at individual provisions in a contract, a mental capacity challenge can logically be directed only at the entire contract.
 

 In the present case, although Spahr signed the Cash Account Agreement, which contains a promise to arbitrate "any controversy arising out of or relating to" the agreement, he contended below and continues to argue here that the overall agreement is unenforceable because he was mentally incompetent when he entered into the contract. We hold that Spahr's mental incapacity defense naturally goes to both the entire contract and the specific agreement to arbitrate in the contract. Therefore, Spahr's claim that he lacked the mental capacity to enter into an enforceable contract placed the "making" of an agreement to arbitrate at issue under §$ 4 of the FAA. In determining that the June 5, 1995, Cash Account Agreement was unenforceable, the district court acted within its authority under § 4.
 

 Spahr, at 1271-73 (footnotes omitted and emphasis added).
 

 [T23] In this case, we do not find any undisputable evidence that the Tanners clearly and unmistakably consented to have this matter submitted to arbitration. Also under Spahr, a broad provision to arbitrate all disputes arising out of or relating to the overall contract, as is the case here, does not provide the requisite clear and unmistakable consent to submit the question of arbitrability to an arbitrator. Spahr, at 1271. In addition, the Tanners do not challenge the entire contract, but rely upon it, in part, with respect to their claims against Fox and TIC. Rather, they contest the validity of the arbitration provision within the contract. Thus pursuant to Spahr and its related predecessor cases of First Options and Howsam, the issue remains one of arbitrability or a "gateway dispute" which should be properly determined by a court and not an arbitrator. We further agree with the astute analysis of the district court, when it stated:
 

 [There is little logic in deciding that an arbitrator should decide a matter and then have him determine that the contract by which he is vested with this authority is void. As Mr. Reuben noted in his article, it would, "border on the absurd [to compel] into arbitration a party to a legally unen-foreeable contract merely because of the presence of an arbitration provision in the otherwise unenforceable contract." Reuben, supra at 876. Finally, the Court agrees with the Court in Shaw v. Kuhnel & Assoc., [102 N.M. 607] 698 P.2d 880, 882 (N.M.1985), that courts are best suited to determine issues of fraud in the inducement, not arbitrators. Courts are governed by procedural and evidentiary rules and are subject to review by appellate courts. Arbitration proceedings are more informal, and substantive and procedural rules are not necessarily applied. Reuben, supra at 822; Riverton Valley Electric Ass'n v. Pacific Power & Light Co., 391 P.2d 489, 495 (1964). Review of arbitration proceedings is very narrow. W.S.
 
 *946
 
 § 1-86-114(a). In effect, the institutional competency of a court, especially in regards to issues of common law contract formation (e. fraud), is greater than that of arbitrators.
 

 [¶24] Finally, Fox and TIC argue that even assuming that Barber defrauded the Tanners by ultimately taking their money, there was no proof whatsoever that Barber ever fraudulently induced the Tanners to agree to arbitration. Fox and TIC rely on the Tanners' testimony given at deposition to support this contention and also to support their ultimate conclusion that the district court's finding of fraud in the inducement of the arbitration provision used within the agreements was clearly in error and should be summarily reversed. Apparently in making this argument, Fox and TIC again argue that the district court should have applied the holding in Prima Paint Corp. v. Flood & Conklin Mfg., that, under the FAA, a general attack on a contract on the ground of fraud in the inducement is a severable claim that is referable to arbitration, and only a claim of fraud in the inducement that is addressed to the arbitration provision, itself, should be adjudicated by the court rather than by an arbitrator.
 

 [¶25] We do not find this argument compelling. In particular, our review of the ree-ord does not uncover a finding by the district court that fraud in the inducement of the arbitration provision used within the agreements occurred. Rather, the district court merely recognized that the Tanners had alleged within the complaint that Barber defrauded the Tanners by ultimately taking their money. As such, it was appropriate for the district court to assess such an issue during the further development of the case as opposed to sending this determination on to an arbitrator. In any event, even assuming that the district court relied upon a finding that Barber had fraudulently induced the Tanners into arbitration in making its decision on the subject motion, we find such reliance to be inconsequential. As explained in detail above, we hold that there are numerous other substantive reasons to uphold the district court's denial of the motion of Fox and TIC.
 

 CONCLUSION
 

 [¶26] Given those reasons set forth above, the actions of the district court are affirmed.
 

 [1]
 

 . The district court converted the motion into a motion to compel arbitration and stay proceedings pending arbitration pursuant to Wyo. Stat. Ann. § 1-36-104(c) (Lexis Nexis 2003), applicable state and federal law, and the specific language used within the subject arbitration clauses.
 

 [2]
 

 . Ms. O'Hearn, Mr. Fitzgerald, and Mr. Barber are not parties to this appeal.
 

 [3]
 

 . Reuben defines the doctrine of competence-competence, or kompetenz-kompetenz, which is most familiar in the international or comparative commercial arbitration context, as generally referring to the independent authority of the arbitrator to decide the limits of his or her own jurisdiction. Reuben, at 836.