2007 WY 64

Daniel M. PITTARD, Appellant
(Defendant),

v.

GREAT LAKES AVIATION,
Appellee (Plaintiff).

No. 05–230.

Supreme Court of Wyoming.

April 24, 2007.

Representing Appellant: David G. Ditto of Associated Legal Group, LLC, Cheyenne, Wyoming.

Representing Appellee: Bradley T. Cave of Holland & Hart, LLP, Cheyenne, Wyoming; Dannie B. Fogelman of Ford & Harrison, LLP, Washington, DC. Argument by Mr. Fogelman.

Before VOIGT, C.J., and GOLDEN, HILL *, KITE, and BURKE, JJ.

KITE, Justice.

[¶ 1]  Daniel M. Pittard appeals from an order granting summary judgment for Great Lakes Aviation (Great Lakes) on its breach of contract claim. He contends the district court erred by: 1) assuming jurisdiction of an employment dispute subject to mandatory arbitration under the Railway Labor Act (RLA), 45 U.S.C. § 151 et seq.; 2) enforcing an individual contract that conflicts with a collective bargaining agreement; and 3) granting summary judgment despite the existence of genuine issues of material fact on his affirmative defenses and counterclaims. We affirm.

* Chief Justice at time of oral argument.

## ISSUES

[¶ 2]  The issues for our determination are:

1.  Whether Great Lakes' state law breach of contract claim was pre-empted by the RLA.

2.  Whether the district court erred in enforcing an agreement that allegedly conflicted with and was superseded by the collective bargaining agreement.

3.  Whether the district court properly granted summary judgment on Great Lakes' breach of contract claim.

## FACTS

[¶ 3]  In June of 2002, Mr. Pittard submitted an application for employment as a pilot with Great Lakes. At the time, he was employed as chief pilot at a pilot training school in California. A few weeks after receiving his application, Great Lakes informed Mr. Pittard that he had been approved to fly for Great Lakes subject to successful completion of training to qualify him as a pilot on the BE 1900, a commercial turbo-prop aircraft. Great Lakes asked Mr. Pittard to report for training in Cheyenne on August 5, 2002.

[¶ 4]  Mr. Pittard quit his job in California and relocated to Colorado. On August 5, 2002, he reported for training in Cheyenne. He was presented with a pilot training agreement and a promissory note, which he signed and dated that day. The pilot training agreement provided that Mr. Pittard was a pilot candidate being considered for training and, if he successfully completed the training, employment with Great Lakes. It further provided that Great Lakes would advance the cost of the training ($7,500); however, in the event Mr. Pittard was hired by Great Lakes after completing the training but did not remain employed for at least fifteen months, he would be required to repay the $7,500 plus interest at the rate of 9.5% per year. The promissory note evidenced Mr. Pittard's agreement to repay the training costs in accordance with the training agreement.

[¶ 5] Mr. Pittard successfully completed the pilot training and was employed by Great Lakes beginning on September 14, 2002. Mr. Pittard resigned from his position with Great Lakes on October 21, 2002, thirty-seven days later. In accordance with the terms of the training agreement, Great Lakes requested reimbursement from Mr. Pittard for the cost of his training. Mr. Pittard did not respond to Great Lakes' requests and, on July 15, 2004, Great Lakes filed a complaint for breach of contract in the Laramie County district court. Great Lakes alleged damages in the amount of $7,356.97, i.e. the $7,500 training cost plus interest less Mr. Pittard's final paycheck which Great Lakes retained as payment toward his alleged debt.

[¶ 6] Prior to and during Mr. Pittard's employment with Great Lakes, Great Lakes' pilots were represented by the International Brotherhood of Teamsters, Airline Division, Teamsters Local 747 (Local 747), which had entered into a collective bargaining agreement (CBA) with Great Lakes in 1997. Of relevance to the present dispute, the CBA provided that any subsequent agreements between parties to the CBA shall "become a part of" the CBA. It also provided that pilots employed by Great Lakes "shall not be required to pay for any training." The CBA also established a procedure for resolving grievances arising under its terms and provided that decisions concerning such grievances were final and binding.

[¶ 7] On August 4, 2004, Local 747 filed a grievance with Great Lakes asserting that the training agreement Mr. Pittard had been required to sign violated the provision of the CBA prohibiting Great Lakes from requiring pilots to pay for training. Great Lakes rejected the grievance and, on August 17, 2004, Local 747 filed a grievance with the system board of adjustment, the board established pursuant to the RLA to decide disputes arising under the CBA.

[¶ 8] While the grievance was pending before the system board of adjustment, Great Lakes' claim in district court proceed-

ed. Mr. Pittard filed an answer to the complaint in which he asserted, among other affirmative defenses, that Great Lakes' claim was precluded because the training agreement was unconscionable, he signed it under duress, and Great Lakes failed to disclose material information prior to having him sign the agreement. Mr. Pittard also filed a counterclaim for negligent misrepresentation and nondisclosure, breach of the implied covenant of good faith and fair dealing, breach of contract and violation of Wyo. Stat. Ann. § 27–4–104 (LexisNexis 2005).[1]

[¶ 9] Great Lakes answered the counterclaim and then filed a motion for summary judgment. In its memorandum supporting the motion, Great Lakes argued summary judgment was appropriate on its breach of contract claim because the contract unambiguously provided that if Mr. Pittard did not remain employed by Great Lakes for at least fifteen months, he would be required to repay the $7,500 training cost with interest. Great Lakes alleged that the terms of the agreement, the fact that Mr. Pittard left his employment after thirty-seven days and the amount of damages were undisputed; therefore, it was entitled to judgment as a matter of law on its breach of contract claim. Great Lakes further argued it was entitled to summary judgment on Mr. Pittard's counterclaim because contrary to his assertions of nondisclosure, the evidence was undisputed that he was aware of the terms of the agreement before he accepted employment with Great Lakes.

[¶ 10] Mr. Pittard filed a response to Great Lakes' motion together with a motion to dismiss or alternatively for partial summary judgment. Mr. Pittard sought dismissal of the action on the grounds that Great Lakes' breach of contract claim was preempted by the mandatory arbitration provisions of the RLA. Alternatively, Mr. Pittard sought partial summary judgment on the ground that the CBA superseded any individual agreement between himself and Great Lakes. Responding to Great Lakes' summary judgment motion, Mr. Pittard asserted genuine

---

1. The statute requires an employer to pay wages earned by an employee within five days after employment ends.

issues of material fact existed concerning the enforceability of the agreement, specifically as to his claims that the agreement was unconscionable, there was insufficient consideration for the agreement and Great Lakes failed to disclose material terms of the agreement.

[¶ 11]  The district court convened a hearing on the motions.  After the hearing, the court entered an order granting Great Lakes' motion and denying Mr. Pittard's motion.  The district court found the following facts were undisputed:

> [Mr. Pittard] completed an online employment application on June 27, 2002.  On the application, [Mr. Pittard] answered "Yes" to the question, "Are you willing to sign a training agreement?"  Thereafter, on August 5, 2002, and prior to beginning his training with the Company, [Mr. Pittard] was presented with a Pilot Training Agreement ("Agreement") and a Promissory Note, which [he] signed.  According to the terms of the Agreement, [Mr. Pittard] agreed to reimburse [Great Lakes] the stipulated cost of his training ($7,500.00) should he resign, voluntarily terminate his employment, or be discharged at any time during his training or within fifteen (15) months of his actual hire date.  [Mr. Pittard] voluntarily resigned his employment with [Great Lakes] on October 21, 2002, 37 days after his hire date.  In accordance with the parties' Agreement, [Great Lakes] withheld $1,241.51 from [Mr. Pittard's] final paycheck.  [Mr. Pittard] did not challenge this withholding.  [Great Lakes] demanded payment of the balance owed, but [Mr. Pittard] refuses to satisfy his breach of the Agreement.

[¶ 12] The district court concluded these undisputed facts showed that the parties entered into a valid and binding agreement, and Mr. Pittard breached the agreement.  The court ordered Great Lakes to submit a motion for entry of judgment together with affidavits showing the amount due under the agreement and promissory note and an application for attorney's fees and costs.  Thereafter, based upon the affidavits, the district court entered judgment awarding Great Lakes $7,225.74, the amount due on the promissory note, plus $6,362.00 for attorney's fees and costs, for a total judgment of $13,587.74.

[¶ 13]  Mr. Pittard appealed the district court's order to this Court.  After he filed his appellate brief, but before Great Lakes filed its brief, the system board of adjustment issued a decision on Local 747's grievance.  In its decision, the arbitrator concluded the CBA permitted Great Lakes to enforce pre-employment training agreements requiring pilot candidates to reimburse the cost of pre-employment training in the event they were hired but did not remain employed by Great Lakes for at least fifteen months.[2]

## STANDARD OF REVIEW

[¶ 14]  When reviewing an order granting summary judgment, we consider the record *de novo*.  *Hincks v. Walton Ranch Co.*, 2007 WY 12, ¶ 7, 150 P.3d 669, 670 (Wyo.2007).  Our review of orders granting summary judgment is governed by W.R.C.P. 56(c), which provides in pertinent part:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

We view the evidence offered in support of and in opposition to the motion in the light most favorable to the party opposing the motion and give that party the benefit of all favorable inferences which may be fairly drawn from the record.  *Hincks,* ¶ 8, 150 P.3d at 670.  A genuine issue of material fact exists when a disputed fact, if proven, would have the effect of establishing or refuting an

---

2.  Because the arbitrator did not issue its decision until after Mr. Pittard appealed from the district court's order, the decision is not part of the appellate record.  Rather, the decision is attached as an appendix to Great Lakes' brief.  We take judicial notice of the decision.  *Henneberger v. County of Nassau,* 465 F.Supp.2d 176, 184 (U.S.D.C.E.D.N.Y.2006); *Green Tree Fin. Corp. v. Honeywood Dev. Corp.,* 2001 U.S. Dist. LEXIS 654, n. 4.

essential element of an asserted cause of action or defense. *Id.*

## DISCUSSION

### 1. Pre-emption by RLA

[¶ 15] Mr. Pittard's first claim on appeal is that Great Lakes' state law breach of contract claim was pre-empted by federal law because it arose from an employment dispute between an employee and an air carrier governed by the RLA[3] and such disputes are subject to a mandatory arbitration procedure. Pursuant to the 1997 CBA entered into by Great Lakes and Local 747, Mr. Pittard claims the system board of adjustment had exclusive jurisdiction over Great Lakes' dispute with him.

[¶ 16] Great Lakes argues the mandatory arbitration procedure provided by the RLA does not apply to its breach of contract claim because the arbitration procedure only applies to disputes requiring interpretation of the CBA and its contract claim does not involve interpretation of the CBA. Because the contract claim is based entirely on a separate, individual, pre-employment agreement between Great Lakes and Mr. Pittard, Great Lakes asserts it is entirely independent of the CBA and does not implicate the system board of adjustment or the RLA.

[¶ 17] In its order, the district court resolved the preemption issue as follows:

> The issue of whether the Agreement violates the collective bargaining agreement is for the System Board of Adjustment to decide. Unless, and until, the System Board of Adjustment determines that the terms of the parties' Agreement violate the collective bargaining agreement, [Great Lakes] has every right to enforce the terms of the Agreement. *Consolidated Rail Corporation v. Railway Labor Executives' Association*, 491 U.S. 299, 109 S.Ct. 2477, 105 L.Ed.2d 250 (1989). The issue properly before this Court is whether the parties entered into a valid and binding agreement, and whether [Mr. Pittard] violated that agreement, not whether the

Agreement violates the collective bargaining agreement.

[¶ 18] We disagree with the district court's conclusion that Great Lakes was free to enforce the training agreement in state court without a determination by the arbitrator as to whether the agreement violated the CBA. The issue concerns Congress' power to preempt state law, which power is derived from the Supremacy Clause of Article VI of the United States Constitution. *Allis–Chalmers Corp. v. Lueck*, 471 U.S. 202, 208, 105 S.Ct. 1904, 85 L.Ed.2d 206 (1985). While congressional power to legislate in the area of labor relations has long been recognized, Congress has never occupied the entire field of labor legislation. *Id.* The question whether a certain state action is pre-empted by federal law is one of congressional intent. *Id.*

[¶ 19] Congress' purpose in passing the RLA was to promote stability in labor-management relations by providing a comprehensive framework for resolving labor disputes. *Hawaiian Airlines, Inc. v. Norris*, 512 U.S. 246, 250, 114 S.Ct. 2239, 129 L.Ed.2d 203 (1994). To accomplish this purpose, the RLA established a mandatory arbitration procedure for the prompt and orderly settlement of two classes of disputes. *Id.* The first class, major disputes, involves disputes over the formation of a CBA or efforts to secure one. *Id.* The second class, minor disputes, involves disputes over the meaning of an existing CBA in a particular fact situation. *Id.* Thus, major disputes seek to create contractual rights; minor disputes seek to enforce them. *Id.* Both types of disputes are resolved through the RLA processes, which include the employer's internal dispute resolution procedure and an adjustment board established by the employer and the union. A determination that a dispute constitutes a major or minor dispute under the RLA preempts a state law cause of action.

[¶ 20] Great Lakes' claim against Mr. Pittard did not concern a dispute over the formation of a CBA. Its claim, therefore, did not constitute a major dispute governed by the

---

**3.** The RLA was extended in 1936 to cover the airline industry. *See* Act of April 10, 1936, ch. 166, 49 Stat. 1189; 45 U.S.C. §§ 181–188.

RLA. The claim, however, did involve a dispute over the meaning of a CBA such that it may have constituted a minor dispute governed by the RLA. We turn to consideration of the types of minor disputes involving CBAs that are governed by the RLA.

■ [¶ 21] The RLA preempts minor disputes that are grounded in the CBA. It does not preempt disputes involving rights or obligations that exist independently of the CBA. Among the many cases illustrating the difference between disputes grounded in the CBA and those involving rights independent from the CBA are *Andrews v. Louisville & N.R. Co.,* 406 U.S. 320, 92 S.Ct. 1562, 32 L.Ed.2d 95 (1972) and *Atchison, T. & S.F.R. Co. v. Buell,* 480 U.S. 557, 107 S.Ct. 1410, 94 L.Ed.2d 563 (1987). In *Andrews,* the employee's wrongful discharge claim was based on an alleged breach of the CBA. The Court held the state law claim was pre-empted, stating:

> Here it is conceded by all that the only source of petitioner's right not to be discharged, and therefore to treat an alleged discharge as a "wrongful" one that entitles him to damages, is the collective-bargaining agreement between the employer and the union. Respondent in this case vigorously disputes any intent on its part to discharge petitioner, and the pleadings indicate that the disagreement turns on the extent of respondent's obligation to restore petitioner to his regular duties following injury in an automobile accident. The existence and extent of such an obligation in a case such as this will depend on the interpretation of the collective-bargaining agreement. Thus petitioner's claim, and respondent's disallowance of it, stem from differing interpretations of the collective-bargaining agreement.

406 U.S. at 324, 92 S.Ct. 1562. In contrast, in *Buell,* the railroad employee's claims were brought under the Federal Employers' Liability Act (FELA), 45 U.S.C. § 51 et seq., which provides a remedy for railroad workers injured due to an employer's or co-worker's negligence. The Court held the claims were not pre-empted. The Court said:

> The fact that an injury otherwise compensable under the FELA was caused by conduct that may have been subject to arbitration under the RLA does not deprive an employee of his opportunity to bring a FELA action for damages....
>
> The FELA not only provides railroad workers with substantive protection against negligent conduct that is independent of the employer's obligations under its collective bargaining agreement, but also affords injured workers a remedy suited to their needs, unlike the limited relief that seems to be available through the Adjustment Board.

480 U.S. at 564–65, 107 S.Ct. 1410.

[¶ 22] The standard applied in RLA cases is virtually identical to the pre-emption standard the United States Supreme Court has employed in cases involving § 301 of the Labor Management Relations Act (LMRA), 29 U.S.C. § 185. For example, in *Lingle v. Norge Div. of Magic Chef, Inc.,* 486 U.S. 399, 108 S.Ct. 1877, 100 L.Ed.2d 410 (1988), a LMRA case, the Court said that where the resolution of a state-law claim depends on an interpretation of the CBA, the claim is pre-empted. However, purely factual questions about an employee's conduct or employer's conduct or motive do not require a court to interpret any term of a CBA. "As long as the state-law claim can be resolved without interpreting the agreement itself, the claim is 'independent' of the agreement for ... preemption purposes." *Id.* at 410, 108 S.Ct. 1877.

[¶ 23] Concluding that *Lingle* provides an appropriate framework for addressing preemption under the RLA, the Court in *Norris* adopted the *Lingle* standard to resolve claims of RLA pre-emption. 512 U.S. at 263, 114 S.Ct. 2239. The Court applied the standard in *Norris* to hold an employee's claim was not pre-empted by the RLA when the employer had a state law obligation, wholly separate from any provision of the CBA, not to fire an employee in violation of public policy or in retaliation for whistle-blowing. Because the issue to be decided—whether the employer's actions gave rise to a wrongful discharge under Hawaii law—was a purely factual question wholly independent of the CBA, the Court held the employee's claims for discharge in violation of public policy and

in violation of the Hawaii Whistleblower Protection Act were not pre-empted by the RLA.

[¶ 24] In the present case, Great Lakes asserts that its state law breach of contract claim was wholly separate from the CBA because it was based upon an individual contract between itself and Mr. Pittard. Therefore, Great Lakes contends, it was not a minor dispute and was not subject to the mandatory RLA arbitration process. Mr. Pittard responds that the pilot training agreement was in direct contravention of the CBA and interpretation of the CBA was necessary in order to determine the validity of the pilot training agreement. Therefore, he asserts, the state law claim could not be resolved without interpreting the CBA and the state law claim was pre-empted.

[¶ 25] The CBA provides in relevant part as follows:

### Section 1

### Recognition and Scope

\* \* \* \*

B. This Agreement shall supersede all existing or previously executed Agreements by and between the Company and the Union or any other labor organization or individual with respect to the rates of pay, rules, or working conditions specifically covered by the provisions of this Agreement in accordance with the provisions of the Railway Labor Act as amended. *Any and all subsequent Agreements between the parties shall be reduced to writing, signed by their authorized representatives, and become a part of this Agreement.*

(emphasis added).

### Section 11

### Training

A. General Guidelines

\* \* \* \*

17. A pilot employed by the Company shall not be required to pay for any training. . . . This includes all Compa-

ny initial, recurrent, flight training, ground training and checkrides.

[¶ 26] Although Great Lakes' breach of contract claim was based upon the individual training agreement with Mr. Pittard, the validity of that agreement was dependent upon an interpretation of the two provisions of the CBA quoted directly above. Because the issue to be decided—whether Mr. Pittard breached the training agreement and was liable for damages—could not be decided without first determining whether the agreement was valid under the CBA, the state law claim was not resolvable without interpreting the CBA and the state law claim should not have proceeded without a ruling from the arbitrator. The district court's conclusion to the contrary was in error and its ruling on the state law claim was premature. As this case evolved, however, we conclude the error was harmless. Upon a ruling by the arbitrator on Local 747's grievance, the district court would have been free to decide whether summary judgment was appropriate on Great Lakes' state law breach of contract claim. Given the arbitrator's ruling that the training agreement did not violate the CBA, no harm resulted from the district court prematurely ruling on the motion.

### 2. District Court's Authority to Determine Whether the Agreement Violated the CBA

[¶ 27] In his appellate brief, which he filed prior to the arbitrator's ruling, Mr. Pittard's second claim was that the district court erred in enforcing the pilot training agreement because it conflicted with and was superseded by the CBA. As noted, the arbitrator subsequently issued his ruling, concluding that Great Lakes' training agreement did not violate the CBA. Pursuant to the terms of the CBA, the arbitrator's decision is final and binding. It would not have been the district court's function, nor is it this Court's function, to review the merits of his decision.

[¶ 28] The United States Supreme Court has said:

Collective-bargaining agreements commonly provide grievance procedures to settle disputes between union and employee with

respect to the interpretation and application of the agreement and require binding arbitration for unsettled grievances. In such cases, and this is such a case, the Court made clear almost 30 years ago that the courts play only a limited role when asked to review the decision of an arbitrator. *The courts are not authorized to reconsider the merits of an award even though the parties may allege that the award rests* on errors of fact or *on misinterpretation of the contract.* * * * As long as the arbitrator's award "draws its essence from the collective bargaining agreement," and is not merely "his own brand of industrial justice," the award is legitimate.

* * * *

"The courts, therefore, have no business weighing the merits of the grievance, considering whether there is equity in a particular claim, or determining whether there is particular language in the written instrument which will support the claim."

* * * *

[A]s long as the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority, that a court is convinced he committed serious error does not suffice to overturn his decision. Of course, decisions procured by the parties through fraud or through the arbitrator's dishonesty need not be enforced. But there is nothing of that sort involved in this case.

*United Paperworkers Int'l Union, AFL–CIO v. Misco, Inc.,* 484 U.S. 29, 36–38, 108 S.Ct. 364, 98 L.Ed.2d 286 (1987) (emphasis added; citations omitted).

[¶ 29] *Misco* was a direct appeal to federal court seeking review of an arbitrator's decision. The present case was a separate proceeding filed in state court alleging a state cause of action for breach of an individual contract between employer and employee. There was no arbitrator decision until after the state district court ruled and Mr. Pittard had filed his brief on appeal. Thus, initially neither party to this appeal sought direct review of the arbitrator's decision as

was the case in *Misco.* Despite these differences, we are persuaded the principles espoused in *Misco* apply with equal force in the present case. The arbitrator has ruled that the pilot training agreement did not violate the CBA and we are not at liberty to reconsider that ruling. For a similar result, *see Berman v. Drake Motor Lines, Inc.,* 6 Mass. App.Ct. 438, 376 N.E.2d 889 (1978) (recognizing that while state courts have jurisdiction over actions for wrongful termination of employment covered by a labor agreement ... they should not undertake to review the merits of a grievance decision rendered by an arbitrator). Therefore, we decline to consider Mr. Pittard's claim that the district court erred in enforcing the pilot training agreement because it allegedly violated the CBA.

### 3. Summary Judgment on Affirmative Defenses and Counterclaims

[¶ 30] Mr. Pittard claims the district court erred in granting summary judgment for Great Lakes on its breach of contract claim because genuine issues of material fact existed as to whether the contract was enforceable under the common law. The gist of his claim is that the terms of the training agreement were not discussed with or disclosed to him prior to his arrival in Cheyenne for training at which point he had already quit his job in California and relocated. Then, he asserts, the agreement was foisted upon him without giving him adequate time to review it and with the threat of not being employed by Great Lakes if he refused to sign it. In essence, Mr. Pittard claims the training agreement was unenforceable because Great Lakes' nondisclosure of its terms was unconscionable and he signed it under duress.

[¶ 31] Viewed in the light most favorable to Mr. Pittard, the following evidence was presented in support of his claims. Mr. Pittard submitted an affidavit in which he stated that prior to accepting the offer with Great Lakes, quitting his job in California, moving to Colorado and arriving in Cheyenne to begin training, he was not informed that he would be required to repay the training costs if he did not remain employed by Great

Lakes for a specified time period. He stated that finances were a major concern for him at the time and he would not have accepted employment with Great Lakes had he known about the re-payment obligation. On the first day of training in Cheyenne, the pilot training agreement was placed in front of him and he was told he must sign it if he wanted to work for Great Lakes. He felt he had no choice but to sign the agreement since he had already quit his previous job and moved.

[¶ 32] Mr. Pittard also submitted an affidavit from another pilot, Dale Kessler, in support of his counterclaims. Mr. Kessler stated he went through pilot training with Great Lakes in 2001 and was not informed about a training agreement or a requirement to repay training costs. After the training, Great Lakes informed him the company had miscalculated and did not need him. Great Lakes called him for training again in August 2002. Prior to arriving in Cheyenne, he was not informed about a training agreement or requirement to repay training costs. When he reported for training on August 5, 2002, he was given a copy of the training agreement and told he had to sign it if he wanted to work for Great Lakes. This was the first time Great Lakes mentioned a training agreement to him. Like Mr. Pittard, Mr. Kessler felt he had no choice but to sign the agreement since he had already quit his previous job.

[¶ 33] We do not lightly interfere with the freedom of contract. *Roussalis v. Wyo. Med. Ctr., Inc.*, 4 P.3d 209, 247 (Wyo.2000). We, therefore, approach claims that a contract is unconscionable cautiously. *Id.* The question of whether a contract is unconscionable is determined as of the time the contract was made and not in hindsight. *Id.*

[¶ 34] In deciding whether a contract is unconscionable, we consider the claim from two perspectives. First, we consider whether the contract provisions unreasonably favor one party over the other. Second, we consider whether the latter party lacked a meaningful choice in entering into the contract. The first perspective concerns the contract's substantive unconscionability.

The second concerns its procedural unconscionability. As noted in *Roussalis,* 4 P.3d at 246, most courts require evidence of both and take a balancing approach in applying them. In other words, both the absence of meaningful choice and the presence of contract provisions unreasonably favorable to one party must be found in order to sustain a claim that a contract is unconscionable. *Id.*

[¶ 35] We have identified the following factors for consideration in addressing claims that a contract is procedurally unconscionable:

> [D]eprivation of meaningful choice as to whether to enter into the contract, compulsion to accept terms, opportunity for meaningful negotiation, such gross inequality of bargaining power that negotiations were not possible, characteristics of alleged aggrieved party (underprivileged, uneducated, illiterate, easily taken advantage of), and surprise by fine print or concealed terms.

*Id.* at 247. Viewed in the light most favorable to Mr. Pittard, evidence was presented tending to show several of the factors necessary for procedural unconscionability, including evidence suggesting that he did not have an opportunity for meaningful negotiation and was surprised by terms allegedly concealed from him. However, no evidence was presented showing the training agreement itself was substantively unconscionable. Mr. Pittard presented no evidence showing that the provision requiring him to repay the $7,500 cost of training if he did not remain employed by Great Lakes for more than fifteen months unreasonably favored Great Lakes over him. To the contrary, given that Great Lakes was agreeing to provide valuable training for free, it was not unreasonable for it to require repayment if the employment ended prematurely before it received the benefit of the trained pilot's service. Absent evidence that the training agreement was both procedurally and substantively unconscionable, summary judgment was appropriate on the breach of contract claim because Mr. Pittard did not establish the existence of a genuine issue of material fact on his affirmative defense that the agreement was unconscionable.

[¶ 36] As a second affirmative defense, Mr. Pittard claimed that he signed the training agreement under duress. We have said duress exists whenever a person is induced, by the unlawful act of another, to perform some act under circumstances which deprive him of the exercise of free will. *Kendrick v. Barker*, 2001 WY 2, ¶ 24, 15 P.3d 734, 741 (Wyo.2001). Because Mr. Pittard alleged that he had no choice but to sign the agreement after having quit his job in California and relocated to Colorado, his claim was one of economic duress. *Id.*

[¶ 37] In order to prove a claim of economic duress, Mr. Pittard must show: (1) he involuntarily accepted the terms of the training agreement; (2) circumstances permitted no other alternative; and (3) such circumstances were the result of coercive acts by Great Lakes. *Id.* He must show that he was the victim of a wrongful act and had no reasonable alternative but to agree with Great Lakes' terms or be faced with a serious financial hardship. *Id.* Whether particular circumstances are sufficient to constitute economic duress is a question of law; the existence of those circumstances is a question of fact. *Blubaugh v. Turner*, 842 P.2d 1072, 1074-75 (Wyo.1992).

[¶ 38] We applied these principles in *Blubaugh* to uphold summary judgment on a claim of economic duress. In *Blubaugh*, an employee was summoned to his employer's office and told he could resign or be terminated. He was presented with a release providing that if he resigned and released his employer from any future claims, he would receive his normal separation pay plus an additional $4,500 and outplacement counseling. He signed the release and later filed suit, alleging among other claims a claim for economic duress. In resistance to the employer's summary judgment motion, the employee claimed he was told if he did not resign and sign the release, he would be fired and would lose the opportunity for outplacement counseling and the additional $4,500. He also claimed he was not given an opportunity to negotiate any of the terms of the release agreement and was in a state of shock from being told to resign or be fired. In upholding the summary judgment, we

agreed with the district court's conclusion that, even assuming the facts alleged by the employee were true, those facts did not show he was deprived of the exercise of free will or that he had no viable alternative but to resign and sign the release. The court specifically noted those claiming economic duress must provide evidence they would "face such immediate financial ruin that they could not seek a remedy to provide redress to them...." *Id.* at 1076.

[¶ 39] More recently, we applied these same principles to reverse a judgment awarded after a bench trial on an economic duress claim. In *Dobson v. Portrait Homes, Inc.*, 2005 WY 95, 117 P.3d 1200 (Wyo.2005), after Portrait Homes settled a lien claim against its property, it sued claiming the settlement was obtained under duress because it had to pay the lien claim or risk derailing a pending sale of the property thus creating economic duress. We held Portrait Homes failed to prove the last two elements necessary for a claim of economic duress, i.e. that it had no reasonable alternative other than to pay the outstanding amount on the lien and that the lien claimant's act in furtherance of its lien was wrongful.

[¶ 40] As these cases illustrate, more is required from a party asserting economic duress than bald assertions that he or she was deprived of the exercise of free will, had no reasonable alternative and was coerced by another's wrongful act. To establish a *prima facie* claim for economic duress sufficient to withstand summary judgment, a party must present concrete evidence of the particular factors depriving him of his free will and giving him no reasonable alternative. A party must also present evidence showing that he was coerced by wrongful conduct. Bare allegations that these circumstances existed, without specifics showing their existence, are not sufficient.

[¶ 41] Mr. Pittard's evidence consisted of his affidavit and that of another pilot, stating they were not informed before they reported for training of the contractual provision requiring reimbursement of the training costs if they left Great Lakes' employment within fifteen months. Mr. Pittard's affidavit also stated he quit his former employment and

relocated to Cheyenne based on Great Lakes' offer of employment. We hold this evidence was insufficient to create a genuine issue of material fact on the issue of whether he was deprived of the exercise of free will. Mr. Pittard made no showing that he was not free to refuse to sign the training agreement and look for a job elsewhere. Viewed in the light most favorable to Mr. Pittard, the evidence that he quit his job in California and relocated to Wyoming and only then realized that he would have to re-pay the $7,500 if he was not employed for at least fifteen months simply did not show he faced "immediate financial ruin" and had no alternative remedy. He presented no evidence showing why he could not have refused to sign the agreement and, if his refusal caused Great Lakes not to hire him, looked for a job elsewhere. In fact, just over a month later, he voluntarily chose to terminate his employment with Great Lakes, suggesting he was not so financially burdened that he was unable to leave Great Lakes and seek other employment.

[¶ 42] Finally, Mr. Pittard failed to present evidence sufficient to survive summary judgment on the issue of whether Great Lakes' conduct was wrongful. Even viewed in the light most favorable to Mr. Pittard, there is no evidence that Great Lakes intentionally concealed the details of the training agreement in order to coerce him into quitting his job and relocating only to spring it upon him and force him to sign it once in Cheyenne. As a matter of law, the evidence Mr. Pittard presented was not sufficient to sustain his affirmative defense of economic duress and the district court properly granted summary judgment for Great Lakes on its breach of contract claim.

[¶ 43] Mr. Pittard also claims the district court erred in granting summary judgment for Great Lakes on his counterclaims for negligent misrepresentation/nondisclosure and breach of the implied covenant of good faith and fair dealing. He claims genuine issues of material fact existed as to these claims which precluded summary judgment. We address the counterclaims separately, beginning with his claim for negligent misrepresentation. A plaintiff claiming negligent misrepresentation must show:

> One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

*Birt v. Wells Fargo Home Mortg., Inc.*, 2003 WY 102, ¶ 42, 75 P.3d 640, 656 (Wyo.2003). Mr. Pittard presented no evidence indicating Great Lakes presented false information about the requirement of re-paying the cost of training. The essence of his affidavits was that Great Lakes failed to disclose that re-payment was required. We have said nondisclosure of information cannot support a claim for misrepresentation; since nothing has been represented, an essential element of the claim is missing. *Id.* at 657. The district court did not error in granting summary judgment on Mr. Pittard's negligent misrepresentation claim.

[¶ 44] In his counterclaim, Mr. Pittard also alleged that Great Lakes failed to timely disclose that he would be required to sign a pilot training agreement and promissory note pursuant to which he would incur liability if he failed to remain employed for at least fifteen months. Wyoming has not adopted the tort of nondisclosure and Mr. Pittard presents no argument to support its adoption in this case. Absent cogent argument and citation to authority concerning the tort of nondisclosure, we decline to consider it.

[¶ 45] Mr. Pittard also alleged that Great Lakes breached the implied covenant of good faith and fair dealing. Addressing the implied covenant of good faith and fair dealing, this Court has said:

> All contracts of employment contain an implied covenant of good faith and fair dealing. However, a duty giving rise to tort liability for breach of the implied covenant exists only in rare and exceptional cases. In order for a duty to arise, there must be a showing of a special relationship

of trust and reliance between the employee seeking to recover and the employer. "Trust and reliance may be found by the existence of separate consideration, common law, statutory rights, or rights accruing with longevity of service."

*Life Care Ctrs. of Am., Inc. v. Dexter*, 2003 WY 38, ¶ 21, 65 P.3d 385, 394 (Wyo.2003) (citations omitted). Mr. Pittard did not allege the existence or nature of any special relationship of trust and reliance in his counterclaim. In his summary judgment brief, however, he asserted "the [RLA] is a specific statutory provision created to provide protection to employees governed by collective bargaining agreements" and "the CBA imposed a separate obligation on Great Lakes to prevent it from collecting training fees from pilots." In light of the arbitrator's ruling that the pilot training agreement did not violate the CBA, we decline to address Mr. Pittard's argument that the CBA created a special relationship of trust and reliance supporting his claim for breach of the implied covenant of good faith and fair dealing. We also decline to address Mr. Pittard's claim that the RLA gives rise to a special relationship. Other than the statement quoted above from his summary judgment brief, he cites no authority and presents no argument supporting his assertion that the RLA gave rise to a special relationship. Absent proper argument and citation of authority, we simply are not willing to extend Wyoming precedent to conclude that the RLA created a special relationship of trust and reliance between Mr. Pittard and Great Lakes sufficient to support a claim for breach of the implied covenant of good faith and fair dealing.

### CONCLUSION

[¶ 46] A decision on Great Lakes' state law breach of contract claim required interpretation of the CBA entered into between Great Lakes and Local 747, a matter exclusively within the province of an arbitrator. The district court should have stayed or dismissed without prejudice the state action until the arbitrator issued a ruling on the Local 747 grievance. However, any error by the district court in proceeding with the state law claim was harmless given the arbitrator's subsequent ruling that the training agreement did not violate the CBA. The arbitrator's ruling is binding and not subject to reconsideration or review by this Court.

[¶ 47] Addressing Mr. Pittard's affirmative defenses that the training agreement was unconscionable and he signed it under duress, we hold he failed to present evidence showing the existence of a genuine issue of material fact and summary judgment was proper on the breach of contract claim. Finally, with respect to his counterclaims, Mr. Pittard did not present sufficient evidence to support a negligent misrepresentation claim and has failed to present cogent argument or legal authority supporting his claims of nondisclosure and breach of the implied covenant of good faith and fair dealing. We, therefore, decline to address those issues.

[¶ 48] Affirmed.