**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**July 9, 2021**

**Christopher M. Wolpert**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

TWIFORD ENTERPRISES, INC., a
Wyoming corporation; THOMAS JOSEPH
TWIFORD; STANETTA RUTH
TWIFORD; PATRICIA ANNETTE
TWIFORD; JACK IRVING TWIFORD,

     Plaintiffs - Appellants,

v.

ROLLING HILLS BANK & TRUST, an
Iowa corporation,

     Defendant - Appellee.

No. 20-8048
(D.C. No. 1:20-CV-00028-NDF)
(D. Wyo.)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **MATHESON**, **BACHARACH**, and **CARSON**, Circuit Judges.
_____

Plaintiffs-Appellants are Twiford Enterprises, Inc. ("TEI"), and Twiford family

members who are shareholders of TEI and guarantors of its loans (collectively, the

"Twifords"). TEI is a cattle-ranching business in Wyoming. The Twifords have owned

their family ranch since the 19th century. They sued their creditor, Defendant-Appellee

Rolling Hills Bank & Trust ("RHB"), an Iowa-based bank with a branch in Wyoming.

---

[*] This order and judgment is not binding precedent, except under the doctrines of
law of the case, res judicata, and collateral estoppel. It may be cited, however, for its
persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

The complaint alleged that RHB misled the Twifords to induce them to refinance their real estate loans with RHB. It further alleged that RHB, after refinancing the real estate loans, manufactured a default. The district court granted summary judgment for RHB. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm.

## I. BACKGROUND

### A. *Factual History*

In 2014, TEI refinanced its cattle loans with multiple loans from RHB. The cattle loan notes each included the following choice-of-law provision:

> This Note is governed by the laws of Iowa, the United States of America, and to the extent required, by the laws of the jurisdiction where the Property is located, except to the extent such state laws are preempted by federal law.

App., Vol. 4 at 1022.

When it approved TEI's cattle loans, RHB also expressed interest in refinancing TEI's real estate loans. TEI was reticent because financing the cattle and real estate loans with the same lender would cross-collateralize the loans and expose TEI's real estate to the cattle loans' risks. RHB said it would not offer TEI a real estate loan unless it felt comfortable with TEI's business.

TEI claims it requested an advance to pay one of its vendors shortly after RHB issued the cattle loans. RHB expressed surprise, having understood when it issued the cattle loans that TEI was current on its vendor payments. An RHB representative later determined that RHB's concerns had been resolved. But unbeknownst to TEI, RHB's board did not support continued involvement with TEI's cattle loans.

2

RHB's representative again told TEI that RHB wanted to finance its real estate loans, and it did so in 2015. The real estate loans contained Iowa choice-of-law provisions.

After issuing TEI's real estate loans, RHB stopped advancing funds to TEI, causing TEI to fall behind on multiple loans. RHB then found TEI to be in default. TEI was unable to find new lenders to refinance its loans. In May 2016, TEI signed several debt modification agreements with RHB, which amended the maturity date of TEI's loans and revised the payment terms.

The debt modification agreements each contained a waiver:

> **WAIVER.** I waive all claims, defenses, setoffs, or counterclaims relating to the Prior Obligation, or any document securing the Prior Obligation, that I may have. Any party to the Prior Obligation that does not sign this Modification, shall remain liable under the terms of the Prior Obligation unless released in writing by [RHB].

*Id.* at 1025, 1033, 1040, 1047.

TEI also signed two forbearance agreements with RHB, one in June 2016 and one in March 2017. They provided TEI with more time to pay off its loans and an additional $350,000 and $500,000 of credit, respectively.

The forbearance agreements contained similar releases (the "Releases"):

> BORROWER AND GUARANTORS . . . HEREBY ABSOLUTELY, UNCONDITIONALLY AND IRREVOCABLY RELEASE[], REMISE[] AND FOREVER DISCHARGE[] THE LENDER . . . OF AND FROM ALL DEMANDS, ACTIONS, CAUSES OF ACTION, SUITS, COVENANTS, CONTRACTS, CONTROVERSIES, AGREEMENTS, PROMISES, SUMS OF MONEY,

3

ACCOUNTS, BILLS, RECKONINGS, DAMAGES AND ANY AND ALL OTHER CLAIMS, COUNTERCLAIMS, DEFENSES, RIGHTS OF SET-OFF, DEMANDS AND LIABILITIES WHATSOEVER OF EVERY NAME AND NATURE, KNOWN OR UNKNOWN, SUSPECTED OR UNSUSPECTED, BOTH AT LAW AND IN EQUITY, WHICH ANY BORROWER . . . MAY NOW OR HEREAFTER OWN, HOLD, HAVE OR CLAIM TO HAVE AGAINST THE RELEASEES OR ANY OF THEM FOR, UPON, OR BY REASON OF ANY NATURE, CAUSE OR THING WHATSOEVER WHICH ARISES AT ANY TIME ON OR PRIOR TO THE DAY AND DATE OF THIS MODIFICATION AGREEMENT, FOR OR ON ACCOUNT OF, OR IN RELATION TO, OR IN ANY WAY IN CONNECTION WITH THIS MODIFICATION AGREEMENT AND/OR THE LOAN DOCUMENTS, AS AMENDED, SUPPLEMENTED, MODIFIED, RESTATED OR REPLACED THROUGH THE DATE HEREOF.

*Id.* at 1052-53, 1070. The Twifords all signed as guarantors, "specifically consent[ing] to and join[ing] in the agreement and the waivers and releases contained therein." *See id.* at 1055-56, 1073. The forbearance agreements also contained Iowa choice-of-law provisions. *See id.* at 1053, 1071 ("This Modification Agreement shall be governed and construed under Iowa law and applicable laws of the United States of America.").[1]

---

[1] Although the debt modification agreements did not contain choice-of-law clauses, they did contain a clause continuing the terms of the underlying agreements. *See* App., Vol. 4 at 1024, 1032, 1039, 1046 ("[A]ll other terms and provisions in the Prior Obligation survive and continue in full force and effect, except to the extent that they are specifically and expressly amended by th[e] Modification."). The underlying agreements contained Iowa choice-of-law clauses.

4

## B. *Procedural History*

TEI filed a Chapter 11 petition in the Wyoming bankruptcy court.[2]  After taking discovery, the Twifords filed an adversary complaint against RHB, claiming breach of contract, breach of the implied covenant of good faith and fair dealing, negligence, fraud, and negligent misrepresentation.  They alleged that in offering the loans, RHB misrepresented its confidence in the Twifords' business and its intentions to engage in a long-term banking relationship with them.  Having induced the Twifords to refinance their real estate loan with RHB based on these representations, RHB then allegedly manufactured a default.

RHB moved to dismiss.  It also moved the district court to withdraw its referral of the adversary case to the bankruptcy court.[3]  The district court granted the withdrawal motion, thereby transferring proceedings to the district court.[4]

---

[2] District courts have jurisdiction over "all cases under [T]itle 11," *see* 28 U.S.C § 1334(a), as well as "all civil proceedings arising under [T]itle 11, or arising in or related to cases under [T]itle 11," *id.* § 1334(b).  By Wyoming local rule, "[a]ll cases under Title 11, United States Code, and all proceedings arising under Title 11 or arising in or related to cases under Title 11, shall be automatically referred to the Bankruptcy Judge." *See* D. Wyo. L. Civ. R. 85(a); *see also* 28 U.S.C § 157(a).

[3] *See* 28 U.S.C § 157(d) ("The district court may withdraw, in whole or in part, any case or proceeding referred [to a bankruptcy judge] under this section [about Title 11 proceedings] . . . for cause shown.").

[4] The district court concluded that "this case does not 'arise' under Title 11" and "the claims [are not] . . . sufficiently 'related to a case under [T]itle 11' such that jurisdiction is proper in the Bankruptcy Court."  *See* App., Vol. 4 at 1011.  The parties agree that the district court had diversity jurisdiction under 28 U.S.C § 1332(a).

The district court then converted RHB's motion to dismiss to a motion for summary judgment and granted the motion to RHB. It disposed of most of the Twifords' claims by applying the Iowa Credit Agreement Statute of Frauds. But it also concluded that "even if the majority of Plaintiffs' claims were not barred by application of the statute of frauds, . . . they would be barred by the releases." App., Vol. 7 at 1783. The Twifords now appeal.

## II. DISCUSSION

The Releases bar the Twifords' claims. We reject their contention that economic duress made the Releases unenforceable. We thus affirm.

### A. *Standard of Review*

We review the district court's grant of summary judgment de novo. *See Sandoval v. Unum Life Ins. Co. of Am.*, 952 F.3d 1233, 1236 (10th Cir. 2020). "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). We view the evidence and draw all reasonable inferences in the light most favorable to the Twifords. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

### B. *Analysis*

In the following analysis, we conclude that (1) the choice-of-law provisions in the various loan agreements and Wyoming's choice-of-law rules call for the application of

6

Iowa's substantive law; (2) the Releases bar the Twifords' claims; and (3) economic

duress, the only defense the Twifords present against the Releases, does not apply.

1. **Applicable Law**

    a.  *Legal background*

In this diversity action, "[w]e look to the conflict of laws rules of . . . the forum

state[] to determine which state's laws will be controlling." *Mountain Fuel Supply v.*

*Reliance Ins. Co.*, 933 F.2d 882, 887 (10th Cir. 1991) (citing *Klaxon v. Stentor Elec. Mfg.*

*Co.*, 313 U.S. 487, 491 (1941)); *see also Emps. Mut. Cas. Co. v. Bartile Roofs, Inc.*, 618

F.3d 1153, 1170 (10th Cir. 2010) ("In a diversity action, we apply the substantive law of

the forum state, including its choice of law rules." (quotation omitted)).

The parties' agreements contain Iowa choice-of-law clauses. "The enforceability

of . . . choice of law . . . provisions are questions of law which we review de novo." *Riley*

*v. Kingsley Underwriting Agencies, Ltd.*, 969 F.2d 953, 956 (10th Cir. 1992); *see also*

*Emps. Mut. Cas. Co.*, 618 F.3d at 1170 ("We review the district court's choice-of-law

determination de novo."). We thus apply Wyoming choice-of-law rules to determine

whether to enforce the parties' choice of Iowa law.

"Under Wyoming choice of law rules, the law of the state chosen by the parties to

govern their contract presumptively applies." *R&G Elec., Inc. v. Devon Energy Corp.*,

53 F. App'x 857, 859 (10th Cir. 2002) (unpublished) (citing *Res. Tech. Corp. v. Fisher*

*Sci. Co.*, 924 P.2d 972, 975 (Wyo. 1996); *Restatement (Second) of Conflict of Laws* § 187

(Am. L. Inst. 1971) [hereinafter *Restatement*]).[5] "If, however, the parties select foreign law contrary to the law, public policy, or the general interests of Wyoming's citizens, Wyoming courts will not enforce the parties' choice of law provision." *Id.* (citing *Smithco Eng'g, Inc. v. Int'l Fabricators, Inc.*, 775 P.2d 1011, 1018 (Wyo. 1989)).

The Wyoming Supreme Court also has said that "[i]n analyzing choice of law questions, [it] uses the approach defined by the *Restatement (Second) of Conflict of Laws*." *Elworthy v. First Tenn. Bank*, 391 P.3d 1113, 1120 (Wyo. 2017). "The Restatement . . . generally respects the parties' contractual choice of law." *Bradley v. Bradley*, 164 P.3d 537, 543 (Wyo. 2007). When "the particular issue is one which the parties could have resolved by an explicit provision in their agreement directed to that issue," then "[t]he law of the state chosen by the parties to govern their contractual rights and duties will be applied." *Res. Tech. Corp.*, 924 P.2d at 975 (quoting *Restatement* § 187(1)).

b. *Iowa law applies*

The choice-of-law provisions in the parties' contracts provide that Iowa law shall govern. This selection "presumptively applies." *See R&G Elec., Inc.*, 53 F. App'x at 859. Whether RHB has liability is an "issue . . . which the parties could have resolved by an explicit provision in their agreement," and under the *Restatement*, we apply "[t]he

---

[5] We cite this unpublished opinion as instructive. *See* 10th Cir. R. 32.1 ("Unpublished decisions are not precedential, but may be cited for their persuasive value."); *see also* Fed. R. App. P. 32.1.

law of the state chosen by the parties." *Res. Tech. Corp.*, 924 P.2d at 975 (quoting

*Restatement* § 187(1)).

Iowa law applicable to the Releases is not "contrary to the law, public policy, or

the general interests of Wyoming's citizens." *See id.* Indeed, "long-established

Wyoming precedent" supports the enforcement of agreements relinquishing claims. *See*

*Cowboy's LLC v. Schumacher*, 419 P.3d 498, 502 (Wyo. 2018). The Twifords concede

that "[f]or the examination of the District Court's grant of summary judgment on

Plaintiffs' claims that the forbearance agreements were unenforceable, it makes no

difference what law is applied." *See* Aplt. Br. at 41. They cannot contend that applying

Iowa law to the forbearance agreements would contravene Wyoming public policy.[6]

We thus use Iowa substantive law for our analysis.

## 2. **The Releases**

### a. *Legal background*

Under Iowa law, "a release is a contract . . . governed by the usual rules relating to

contracts." *Verne R. Houghton Ins. Agency, Inc. v. Orr Drywall Co.*, 470 N.W.2d 39, 42

---

[6] The Twifords suggest in their reply brief that Iowa law violates Wyoming public policy. *See* Aplt. Reply Br. at 6. But this contention appears limited to a continuation of their opening brief's argument that the Iowa Credit Agreement Statute of Frauds is contrary to Wyoming policy. *See* Aplt. Br. at 35-38. Our holding based on the Releases does not rely on that Iowa statute. If the Twifords intended to make a broader argument in their reply brief, they have waived it. *See United States v. Pickel*, 863 F.3d 1240, 1259 (10th Cir. 2017) (stating that an appellant "waived" an argument made "for the first time in [its] reply brief"). For the same reason, the Twifords have waived any argument that the choice-of-law clauses "should not be strictly enforced" because the "loan documents were contracts of adhesion." *See* Aplt. Reply Br. at 6.

(Iowa 1991). Thus, "the intent of the parties must control[,] and except in cases of ambiguity, this is determined by what the contract itself says." *Id.* "[I]f the instrument is clearly. . . a full release, there is no room for construction." *Id.*

b. *The Releases bar the claims*

The Releases bar the Twifords' suit. The Twifords do not argue that their claims fall outside the Releases. The Releases state that the Twifords "UNCONDITIONALLY . . . RELEASE[] . . . THE LENDER . . . FROM ALL DEMANDS . . . WHATSOEVER OF EVERY NAME AND NATURE, KNOWN OR UNKNOWN, . . . BOTH AT LAW AND IN EQUITY, WHICH ANY BORROWER . . . MAY NOW OR HEREAFTER . . . HAVE OR CLAIM TO HAVE . . . IN ANY WAY IN CONNECTION WITH . . . THE LOAN DOCUMENTS . . . ." App., Vol. 4 at 1052-53, 1070. The parties plainly intended to enter into a "full release." *See Verne R. Houghton Ins. Agency*, 470 N.W.2d at 42; *see also Lathrop v. Century, Inc.*, No. 01-1058, 2002 WL 31425215, at *4 (Iowa Ct. App. Oct. 30, 2002) ("The appellate courts of [Iowa] have consistently upheld the validity of broadly worded releases.").[7]

---

[7] We would reach the same conclusion under Wyoming law. As in Iowa, releases in Wyoming are "scrutinize[d] . . . with [the] traditional standard for construing contracts." *M & A Constr. Corp. v. Akzo Nobel Coatings, Inc.*, 936 P.2d 451, 456 (Wyo. 1997). The "basic purpose in construing or interpreting a contract is to determine the intention and understanding of the parties. If the contract is in writing and the language is clear and unambiguous, the intention is to be secured from the words of the contract." *Id.* (quotation omitted).

3. **Economic Duress**

   a. *Legal background*

Under Iowa law,[8] "a party claiming economic duress must prove the following elements: (1) a party involuntarily accepted the terms made by another party, (2) circumstances permitted no other alternative, and (3) such circumstances were the result of coercive acts of the other party." *City of Asbury v. Iowa City Dev. Bd.*, 723 N.W.2d 188, 200 (Iowa 2006). "[T]he burden of proving economic duress is upon the party alleging it." *Fees v. Mut. Fire & Auto. Ins. Co.*, 490 N.W.2d 55, 58 (Iowa 1992).

"The assertion of duress must be proven by evidence that the duress resulted from defendant's wrongful and oppressive conduct *and not by plaintiff's necessities*." *Turner v. Low Rent Hous. Agency of City of Des Moines*, 387 N.W.2d 596, 599 (Iowa 1986) (quotation omitted). "[T]he plaintiff must go beyond the mere showing of a reluctance to accept and of financial embar[r]assment." *Id.* (quotation omitted).

Also, the Iowa Supreme Court has said "an alleged victim of duress may not obtain part of the benefits of an agreement and disavow the rest." *Id.* Thus, receiving payment under a settlement agreement precludes a defense of economic duress. *See id.*

---

[8] "[Q]uestions involving the effect of misrepresentation, duress, undue influence and mistake upon a contract are determined by the law chosen by the parties, if they have made an effective choice." *Restatement* § 201 cmt. a.

11

b. *Economic duress does not apply*

The Twifords argue "[t]he release[s] contained with the two forbearance agreements are unenforceable because they were wrongfully procured through economic duress." Aplt. Br. at 39 (all-capitalization and emphasis removed). Their economic duress defense fails.

First, the Twifords cannot overcome the Iowa rule that "an alleged victim of duress may not obtain part of the benefits of an agreement and disavow the rest." *Turner*, 387 N.W.2d at 599. The forbearance agreements extended the period to repay their loans. *See Iowa State Bd. of Eng'g Examiners v. Olson*, 421 N.W.2d 523, 526 (Iowa 1988) ("Forbearance to press a claim may serve as a consideration for a contract of settlement."). They also received $850,000 in additional credit. The Twifords thus received the benefits of both time and money through the forbearance agreements. They therefore cannot disavow the Releases.[9]

Second, to claim economic duress, plaintiffs must show that "no other alternative" existed. *See Turner*, 387 N.W.2d at 598-99. The evidence, viewed in the light most favorable to the Twifords, does not show lack of alternatives. For example, the Twifords do not state they had no available assets they could have liquidated to generate capital in lieu of signing the agreements. Nor do they explain why they could not have brought an

---

[9] *See also Roberts v. Wells Fargo AG Credit Corp.*, 990 F.2d 1169, 1174 (10th Cir. 1993) (concluding under Oklahoma law that "because Wells Fargo was in no way obligated to renew the line of credit note beyond the maturity date, . . . plaintiffs were not entitled to assert economic duress" after accepting the credit extension).

12

action for breach of contract earlier rather than signing the Releases. *See id.* at 599 (noting the possibility a party could "have sued on the contract" presented an "alternative[]" undermining economic duress). They therefore have not "proven by evidence that the duress resulted . . . not by plaintiff's necessities." *See id.* (emphasis and quotation omitted).

Thus, the Twifords cannot claim economic duress.[10]

### III. CONCLUSION

We affirm the district court's judgment.

Entered for the Court

Scott M. Matheson, Jr.
Circuit Judge

---

[10] We would reach the same conclusion under Wyoming law. *See Pittard v. Great Lakes Aviation*, 156 P.3d 964, 975 (Wyo. 2007) ("In order to prove a claim of economic duress, [a plaintiff] must show: (1) he involuntarily accepted the terms of [an] agreement; (2) circumstances permitted no other alternative; and (3) such circumstances were the result of coercive acts by [the defendant].").