2017 WY 122

**KINDRED HEALTHCARE OPERATING, INC.**, a foreign corporation; Kindred Nursing Centers West, LLC, a foreign corporation, d/b/a Kindred Nursing and Rehabilitation-Wind River, Appellants (Defendants),

v.

Susan BOYD, as Personal Representative for purposes of bringing a wrongful death action on behalf of Aletha Boyd, deceased, Appellee (Petitioner).

S-17-0068

Supreme Court of Wyoming.

October 12, 2017

Representing Appellants: Thomas B. Quinn and Christopher R. Jones of Gordon & Rees, LLP, Denver, Colorado. Argument by Mr. Quinn.

Representing Appellee: Diana Rhodes, Esq., Cheyenne, Wyoming; Jason Ochs, Esq., Casper, Wyoming. Argument by Ms. Rhodes.

Before BURKE, C.J., and HILL, DAVIS, FOX, and KAUTZ, JJ.

DAVIS, Justice.

[¶1] Ninety-three-year-old Aletha Boyd (Aletha) died following her discharge from Kindred Nursing and Rehabilitation—Wind River. Her daughter, Susan Boyd (Ms. Boyd), filed a wrongful death action against Kindred alleging that its negligence in caring for her mother caused her death. Kindred moved to compel arbitration pursuant to an alternative dispute resolution (ADR) agreement signed by Leanna Putnam, Aletha's other daughter and representative under a power of attorney at the time of her admission into the facility. The district court denied the motion. Kindred appeals, claiming the district court erred in denying the motion to compel arbitration. We reverse and remand with instructions for the district court to order arbitration.

## ISSUES

[¶2] The issues for this Court's consideration are:

1. Whether Ms. Putnam had the authority to sign the ADR agreement on Aletha's behalf and bind her to arbitration.[1]

---

1. Kindred asks the Court not to address this issue because Ms. Boyd did not present it in the district court. Kindred devoted nine pages in its motion to compel in district court arguing that Ms. Putnam had authority to sign the ADR agreement. Although Ms. Boyd did not respond in district court to Kindred's argument, she has fully briefed the issue for this Court. Because Ms. Putnam's authority was discussed below, the parties have fully briefed the issue, and the evidentiary record is sufficient to allow us to consider it, we will address it.

2. Whether the ADR agreement is unconscionable.
3. Whether the ADR agreement lacks mutuality of assent and consideration in light of the provision incorporating the National Arbitration Forum Mediation Rules and Code of Procedure.[2]

## FACTS

[¶3] Kindred Healthcare Operating, Inc. and Kindred Nursing Centers West, LLC owned and operated a nursing home facility in Riverton, Wyoming under the name Kindred Nursing and Rehabilitation—Wind River (Kindred). On January 8, 2010, Aletha Boyd was admitted to the facility. Prior to her admission, in September of 2001, Aletha had signed a durable general and medical power of attorney designating Ms. Putnam as her attorney in fact and agent. At the time of Aletha's admission into the nursing home, Ms. Putnam signed the ADR Agreement at issue.

[¶4] The title of the agreement is:
**ALTERNATIVE DISPUTE RESOLUTION AGREEMENT (OPTIONAL)**
The next line of the agreement states (emphasis in original):
**(THIS AGREEMENT IS NOT A CONDITION OF ADMISSION TO OR CONTINUED RESIDENCE IN THE FACILITY)**

[¶5] The agreement goes on to provide that the parties to the agreement, ("Kindred Nursing Centers West, LLC, [doing business as] Wind River Healthcare & Rehabilitation Center[3] ... and Aletha Boyd"), agree that any disputes between them arising out of Aletha's stay at the facility "shall be resolved exclusively by an ADR [alternative dispute resolution] process that shall include mediation and, where mediation is not successful, binding arbitration." The agreement further provides:

**THE PARTIES UNDERSTAND, ACKNOWLEDGE, AND AGREE THAT BY ENTERING INTO THIS AGREEMENT THEY ARE GIVING UP THEIR CONSTITUTIONAL RIGHT TO HAVE THEIR DISPUTES DECIDED BY A COURT OF LAW ...:**

It further states:

The Parties recourse to a court of law shall be limited to an action to enforce a binding arbitration decision entered in accordance with this Agreement or to vacate such a decision based on the limited grounds set forth in the Wyoming Uniform Arbitration Act, Wyo. Stat. §§ 1-36-101 through 1-36-119. The parties agree that the speed, efficiency, and cost-effectiveness of the ADR process, together with their mutual undertaking to engage in that process, constitute good and sufficient consideration for the acceptance and enforcement of this Agreement.

[¶6] Aletha remained in the nursing home until she was discharged on May 17, 2014. She died thirteen days later on May 30. The death certificate listed the primary cause of death as dementia.

[¶7] Following Aletha's death, the district court appointed Ms. Boyd as her personal representative for purposes of bringing a wrongful death action. On May 13, 2016, Ms. Boyd, as personal representative of her mother's estate, submitted a notice of claim to the State of Wyoming's Medical Review Panel in accordance with Wyo. Stat. Ann. § 9-2-1513 *et seq.*[4] She asserted that during

2. In response to an argument Ms. Boyd presented in district court, Kindred also addressed the issue of whether the ADR agreement is illegal or void pursuant to a regulation promulgated by the Federal Centers for Medicare and Medicaid Services (FCMMS) banning mandatory arbitration agreements in long-term care facilities. We decline to address the issue because in her brief to this Court, Ms. Boyd conceded the FCMMS withdrew the regulation in 2017. Although she asserts the reasons for the withdrawal were economic and not because the FCMMS changed its view that mandatory arbitration agreements in nursing homes are unfair, the fact remains that the regulation has been withdrawn and the issue of whether the ADR agreement is illegal pursuant to the regulation is moot.

3. Despite the business being identified by another name in the ADR agreement, Kindred's notice of appeal identifies it as Kindred Nursing and Rehabilitation—Wind River. We refer to the entities as "Kindred."

4. The Medical Review Panel Act of 2005 requires claims against healthcare providers, except those subject to a valid arbitration agreement, to be

the time her mother resided at the nursing home, Kindred and its employees failed to meet their legal and contractual obligations to her. Specifically, Ms. Boyd asserted that Kindred and its employees failed to meet nutritional standards, perform proper nursing assessments, properly document, perform a complete assessment, develop and implement a comprehensive care plan, implement proper fall precautions and communicate them to staff, hire adequate and appropriately trained staff, train and supervise staff, provide adequate supervision and assistance for an individual with limited mobility and provide the necessary care to attain and maintain the highest practicable physical, mental and psychosocial well-being of Aletha. Ms. Boyd asserted that these failures on the part of Kindred led to Aletha falling on at least six occasions and suffering injuries, including a fractured hip.

[¶8] Kindred responded to the notice of claim, contending that the dispute was subject to the ADR agreement, and that therefore, pursuant to Wyo. Stat. Ann. § 9-2-1518(a),[5] the medical review panel could not review the claim. As to the specific allegations in the notice, Kindred denied that the care provided to Aletha fell below the standard of care or caused her injuries or death. The Medical Review Panel dismissed the claim, and in August of 2016, Ms. Boyd filed a wrongful death action in district court, again asserting that Kindred's negligence caused her mother's injuries and subsequent death.

[¶9] In response, Kindred filed a motion to compel arbitration. Kindred argued that when Ms. Putnam signed the ADR agreement, she was authorized to act as Aletha's legal and personal representative and had authority to sign the agreement. Kindred further asserted that Ms. Putnam's decision to agree to arbitrate disputes concerning Aletha's care was a health care decision within the meaning of the Wyoming Health Care

Decisions Act and Wyo. Stat. Ann. § 35-22-406. Anticipating a potential argument by Ms. Boyd, Kindred contended that the ADR agreement Ms. Putnam signed was not unconscionable or void as against public policy. Finally, Kindred asserted that Ms. Boyd should be equitably estopped from refusing to honor the ADR agreement because she relied on the other admission documents concerning Aletha's care and should not be allowed to single out one document as invalid.

[¶10] In response to Kindred's motion, Ms. Boyd argued that pre-dispute nursing home arbitration agreements are illegal pursuant to federal regulation; Kindred's ADR agreement was unconscionable; there is no presumption in favor of arbitration in a dispute concerning the validity of an arbitration agreement; Kindred's ADR agreement is invalid because it lacks mutuality and is not supported by consideration; and the invalid provisions are not severable because they go to the very essence of the agreement.

[¶11] After considering the parties' arguments, the district court denied Kindred's motion to compel arbitration without providing reasons for doing so. Kindred timely appealed to this Court.[6]

## STANDARD OF REVIEW

 [¶12] Both the Federal Arbitration Act and the Uniform Arbitration Act adopted by the Wyoming legislature make arbitration agreements "valid, irrevocable, and enforceable save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C.S. § 2; Wyo. Stat. Ann. § 1-36-103 (LexisNexis 2017). Therefore, when deciding whether an arbitration agreement is enforceable, courts apply state law principles governing the formation of contracts. *Fox v. Tanner*, 2004 WY 157, ¶ 18, 101 P.3d 939, 944 (Wyo. 2004) (citing *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944, 115 S.Ct. 1920, 1924, 131 L.Ed.2d 985 (1995)). When

---

filed with and reviewed by a medical review panel before a complaint is filed in a court of law.

**5.** That statute provides that "[t]he [medical review] panel shall review all malpractice claims against health care providers filed with the panel except those claims subject to a valid arbitration

agreement allowed by law ...." Wyo. Stat. Ann. § 9-2-1518(a) (LexisNexis 2017).

**6.** Wyo. Stat. Ann. § 1-36-119(a)(i) and (b) (LexisNexis 2017) authorize a direct appeal from an order denying a motion to compel arbitration.

language is clear and unambiguous, the interpretation and construction of contracts is a matter of law for the courts. *Thorkildsen v. Belden*, 2011 WY 26, ¶ 8, 247 P.3d 60, 62 (Wyo. 2011) (citing *Cheek v. Jackson Wax Museum, Inc.*, 2009 WY 151, ¶ 12, 220 P.3d 1288, 1290 (Wyo. 2009)). We review questions of law *de novo* without giving any deference to the district court's determinations. *Id.* The question of whether a contract is unconscionable is also one of law. *Roussalis v. Wyoming Medical Center, Inc.*, 4 P.3d 209, 245 (Wyo. 2000).

[¶13] Whether an agency relationship exists and the scope of the agent's authority can be questions of fact. *Ohio Cas. Ins. Co. v. W.N. McMurry Const. Co*, 2010 WY 57, ¶ 39, 230 P.3d 312, 327 (Wyo. 2010). However, as with other contracts, construction of a written contract creating an agency and the agent's authority thereunder are questions of law for the courts unless the instrument is ambiguous and depends on conflicting extrinsic evidence. 3 Am.Jur.2d *Agency* § 336; *Thorkildsen* and *Cheek, supra.*

## DISCUSSION

### 1. Ms. Putnam's Authority to Sign the ADR Agreement

[¶14] Kindred argued in district court that Ms. Boyd is bound by the ADR agreement because Ms. Putnam had the express authority to sign it on Aletha's behalf. That authority, Kindred asserted, came from the durable general and medical power of attorney Aletha signed giving Ms. Putnam authority to make "all lawful health care decisions" for her. Kindred argued that a decision to enter into an ADR agreement in connection with admission to a long-term care facility is a "health care decision."

[¶15] Ms. Boyd countered that the power of attorney signed by Aletha authorizing Ms. Putnam to make "all lawful health decisions" qualifies as a "power of attorney for health care" governed by the Wyoming Health Care Decisions Act (WHCDA), citing Wyo. Stat. Ann. § 35-22-403(c)(xiii).[7] Under the WHCDA, "health care" is defined as "any care, treatment, service or procedure to maintain, diagnose or otherwise affect an individual's physical or mental condition." Wyo. Stat. Ann. § 35-22-402(a)(viii). Ms. Boyd contends the WHCDA limits the scope of "health care decisions" as follows:

[ (ix) ] "Health care decision" means a decision made by an individual or the individual's agent, guardian or surrogate, regarding the individual's health care, including:

(A) Selection and discharge of health care providers and institutions;

(B) Approval or disapproval of diagnostic tests, surgical procedures, programs of medication and orders not to resuscitate; and

(C) Directions to provide, withhold or withdraw artificial nutrition and hydration and all other forms of health care.

*Id.* at (a)(ix). Ms. Boyd contends the decision to submit a dispute to arbitration does not fall within these provisions.

[¶16] We find it unnecessary to address whether the decision to sign an ADR agreement is a health care decision because we conclude the general power of attorney unambiguously gave Ms. Putnam actual authority to sign the agreement on Aletha's behalf. Under Wyoming law, an agent is someone with actual or apparent authority to bind a principal to particular obligations. *Ohio Cas. Ins. Co.,* ¶ 39, 230 P.3d at 326-27. An agent has express actual authority to bind the principal when the principal, orally or in writing, specifically grants the agent the power to bind the principal. *Id.*

[¶17] The Durable General and Medical Power of Attorney at issue here provided in pertinent part:

I, Aletha R. Boyd, the principal ... designate Leanna K. Putnam ... my attorney in fact and agent in my name and for my benefit:

1. General Grant of Power. To exercise or perform any act, power, duty, right or obligation whatsoever that I now have or may hereafter acquire, relating to any per-

---

7. Ms. Boyd's brief cites to § 35-22-403(c)(xiii). However, subsection (c) of this statute deals with who shall not be used as a witness for a power of attorney, and there is no subsection (xiii). We assume she meant to cite to § 35-22-402(a)(xiii), defining "Power of attorney for health care."

son, matter, transaction or property ... now owned or hereafter acquired by me ... including by way of example but without limitation, full power and authority to hold, ... and without limitation by statute or rule of law; ... contract, ... carry out agreements, ... settle or contest claims; ... and including by way of example, but without limitation, the following specifically enumerated powers. I grant to my agent full power and authority to do everything necessary in exercising any of the powers herein granted as fully as I might or could do if personally present, ... hereby ratifying and confirming all that my agent shall lawfully do or cause to be done by virtue of this power of attorney and the powers herein granted. Without limitation, my agent shall have the power and authority:

\* \* \*

g. General Documents. To make, ... sign, endorse, ... execute ... such ... contracts, agreements, ... and such other instruments in writing of whatever kind and nature as may be necessary or proper in the exercise of the rights and powers herein granted;

\* \* \*

3. Interpretation. This instrument is to be construed and interpreted as a DURABLE POWER OF ATTORNEY. The enumeration of specific powers herein is not intended to, nor does it, limit or restrict the general powers granted to my agent. This instrument, and the powers and authority of my agent hereunder, shall be governed by and construed in accordance with the law of the State of Wyoming.

\* \* \*

6. Third-Party Reliance. Third parties may rely upon the representations of my agent as to all matters relating to any power granted to my agent, ....

(Emphasis in original).

[¶18] Ms. Boyd argues that this language is not sufficiently broad to authorize Ms. Putnam to sign an arbitration agreement on Aletha's behalf. Quoting *Stone v. First Wyoming Bank N.A., Lusk*, 625 F.2d 332, 345 (10th Cir. 1980), and *Luikart v. Boland*, 45 Wyo. 461, 21 P.2d 542, 543 (1933), she asserts "[i]t is the policy of Wyoming courts to construe powers of attorney strictly, and to hold the principal not bound unless the authority is exercised within the ***undoubted*** limits prescribed by the principal." (Emphasis in original). Citing cases from other jurisdictions, she argues that general "catchall" clauses in a power of attorney should not be construed to expand the limited powers specified in subsequent, more substantive provisions. She contends the "catchall" clause at the beginning of Aletha's power of attorney limited Ms. Putnam's authority to managing property, business and financial matters, and signing the ADR agreement was not related to any of those matters. She also asserts Ms. Putnam's authority was limited to "necessary" acts, the ADR agreement was optional, not necessary, to Aletha's admission into the nursing home and, therefore, signing the ADR agreement was beyond the scope of her authority.

[¶19] Even reading the provisions quoted above strictly, the power of attorney did not limit Ms. Putnam's authority to doing what was necessary with regard to property, business or financial affairs as Ms. Boyd contends. Rather, it gave Ms. Putnam actual authority "to exercise or perform any act, power, ... relating to any person, matter, transaction or property," including "by way of example but without limitation" the power to contract, as fully as Aletha might do if personally present. Rather than limiting Ms. Putnam's authority, the power of attorney gave her the authority "without limitation" to perform specifically enumerated powers, including the power and authority to sign contracts and agreements "of whatever kind" as necessary "or proper" in exercising the powers granted in the general power of attorney. Contrary to Ms. Boyd's contention, the power of attorney did not limit Ms. Putman to signing necessary contracts, but instead gave her broad power to sign agreements as "necessary or proper" in exercising the authority granted to her. Given the broad language of the power of attorney, we hold that it included the authority to sign the ADR agreement.

[¶20] Other courts have reached the same result when asked to interpret powers of attorney containing similar language. In *Jaylene, Inc. v. Moots*, 995 So.2d 566 (Fla. Dist.

Ct. App. 2008), the decedent executed a power of attorney which stated:

> My Agent shall have full power and authority to act on my behalf. This power and authority shall authorize my Agent to manage and conduct all of my affairs and to exercise all of my legal rights and powers, including all rights and powers that I may acquire in the future.

*Id.* at 568.

[¶21] The power of attorney at issue in *Jaylene* also included a list of specific powers granted to the attorney-in-fact, including the power to:

> 4. Take any and all legal steps necessary ... to settle any claim, whether made against me or asserted on my behalf against any other person or entity.
>
> 5. Enter into binding contracts on my behalf.

*Id.* The power of attorney stated that the listing of specific powers was not intended to be exhaustive.

[¶22] After the power of attorney was executed, in conjunction with the decedent's admission into a nursing home, her agent signed an agreement for care that contained an optional arbitration clause. After the decedent's death, her agent filed a wrongful death action against the nursing home. The nursing home filed a motion to compel pursuant to the arbitration clause. The lower court denied the motion, finding that the arbitration clause was valid, but that the power of attorney did not authorize the decedent's agent to sign an arbitration agreement on her behalf. The district court of appeals reversed, holding that the agent had the authority to sign the arbitration agreement. *Id.* at 567-68.

[¶23] Looking at the general grant of authority, the court concluded that the power of attorney "unequivocally expresses the principal's intent to make a comprehensive grant of authority to the attorney-in-fact." *Id.* at 569. Looking at the specific powers granted, the court concluded two of the powers mentioned supported the conclusion that the power of attorney authorized the attorney-in-fact to consent to arbitration:

The POA not only authorizes the attorney-in-fact to "enter into binding contracts," it also authorizes the attorney-in-fact to settle claims held by the principal. Not unlike agreeing to arbitrate, settling a claim typically involves foregoing the remedy of submitting a claim to a court for final adjudication. We are not prepared to state that a grant of the authority to settle claims includes the authority to consent to arbitration. However, the specific grant of authority to settle claims in the document under review in this case is consistent with the view that the POA's broad grant of authority includes the power to consent to arbitration.

*Id.*

[¶24] Other courts have reached the same result. *See Pembroke Health Facilities, L.P. v. Ford*, 2017 WL 2486354, 2017 U.S.Dist. LEXIS 87852 (U.S. Dist. Western Dist. Ky.) (power of attorney vesting agent with "full power ... to transact, handle, and dispose of all matters," including the power "[t]o make contracts" ... "unquestionably encompasses the power to enter into an arbitration agreement"); *Moberg v. Kindred Healthcare Inc.*, No. 14-CV-0254-F (D. Wyo. 2015) (agent had authority to execute arbitration agreement on behalf of principal at time she was admitted into nursing home); *Mitchell v. Kindred Healthcare Operating, Inc.*, 349 S.W.3d 492, 498 (Tenn. Ct. App. 2008) (power of attorney authorizing agent to act as attorney-in-fact "to the same extent" as principal gave agent authority to make the legal decision to execute ADR agreement).

[¶25] The cases Ms. Boyd cites in support of her assertion that Aletha's power of attorney did not authorize Ms. Putnam to sign the ADR agreement are inapposite. In *Estate of Swanson v. United States*, 46 Fed.Cl. 388, 392 (2000), aff'd 10 Fed.Appx. 833 (Fed. Cir. 2001), the court held that a power of attorney authorizing an agent "to compound, compromise, adjust, settle and satisfy any obligation, secured or unsecured, owing by or to me and to give or accept any property and/or money whether or not equal to or less in value than the amount owing in payment, or settlement or satisfaction thereof", did not authorize the agent to gift the principal's money to others.

We have no quarrel with that result. The provision at issue there expressly gave the agent authority to pay amounts owed; it did not grant the power to make gifts.

[¶26] Similarly, in *Fort Dearborn Life Ins. Co. v. Holcomb*, 316 Ill.App.3d 485, 249 Ill. Dec. 384, 736 N.E.2d 578, 588-89 (2000), the court held a power of attorney's "catch-all" provision did not authorize the agent to execute change of beneficiary forms to name herself as beneficiary under a life insurance policy where a specific provision stated she did not have that authority. In *Ping v. Beverly Enters.*, 376 S.W.3d 581, 594 (Ky. 2012), the court held a power of attorney limiting the agents' authority to managing the principal's property and finances and making health-care decisions on her behalf did not authorize the agent to execute an ADR agreement. *See also Carrington Place of St. Pete, LLC v. Estate of Milo*, 19 So.3d 340 (Fla. Dist. Ct. App. 2009) (power of attorney granting agent authority solely related to principal's property did not authorize agent to execute ADR agreement). The powers of attorney in these cases expressly limited the agents' authority. They did not contain the broad language included in Aletha's power of attorney.

[¶27] Ms. Boyd also cites *Testa v. Emeritus Corporation*, 168 F.Supp.3d 1103 (N.D. Ill. 2016), in which the power of attorney authorized the agent to retain counsel on the principal's behalf, appear for him in actions and proceedings to which he may be party, commence actions and proceedings in his name and sign complaints, petitions and other pleadings "of every description" on his behalf. *Id.* at 1112. While noting that the provision might be explicit enough to permit the agent to decide whether to take a claim to arbitration *after* it arises, the court held it was not explicit enough under Arizona law to permit him to sign an ADR agreement with an assisted living facility at the time of the principal's admission when no litigation had arisen. *Id.* at 1113. We are not asked to construe a provision like the one at issue in *Testa* in this case, and do not therefore find it persuasive.

[¶28] Unlike the power of attorney at issue here, none of the powers of attorney in the cases Ms. Boyd cites contained language giving the agent the broad power to "perform any act, power, duty, right or obligation" ... "relating to any person, matter, transaction or property" ... "including by way of example" ... "full power and authority to ... contract, ... [and] carry out agreements." None of those cases involved powers of attorney that specifically authorized "without limitation," the agent to sign agreements "of whatever kind and nature as may be necessary or proper" in exercising the rights and powers granted. We therefore hold that Ms. Putnam had actual authority to sign the optional ADR agreement on Aletha's behalf.

## 2. Unconscionability

[¶29] Ms. Boyd contends the ADR agreement is unconscionable because Kindred included it among the packet of documents Ms. Putnam was required to sign in order to obtain medical care for Aletha, no one explained she was not required to sign it or its effect if she did, and she was emotionally distraught when she signed it and not in a position to make a meaningful determination about its effect or whether she should sign it.

[¶30] We do not lightly interfere with the freedom of contract. *Pittard v. Great Lakes Aviation*, 2007 WY 64, ¶ 33, 156 P.3d 964, 974 (Wyo. 2007) (citing *Roussalis v. Wyo. Med. Ctr., Inc.*, 4 P.3d 209, 247 (Wyo. 2000)). We therefore approach claims that a contract is unconscionable cautiously. *Id.* The question of whether a contract is unconscionable is determined as of the time the contract was made and not in hindsight. *Id.*

[¶31] As we have said,

In deciding whether a contract is unconscionable, we consider the claim from two perspectives. First, we consider whether the contract provisions unreasonably favor one party over the other. Second, we consider whether the latter party lacked a meaningful choice in entering into the contract. The first perspective concerns the contract's substantive unconscionability. The second concerns its procedural unconscionability. As noted in *Roussalis*, 4 P.3d at 246, most courts require evidence of

both and take a balancing approach in applying them. In other words, both the absence of meaningful choice and the presence of contract provisions unreasonably favorable to one party must be found in order to sustain a claim that a contract is unconscionable. *Id.*

We have identified the following factors for consideration in addressing claims that a contract is procedurally unconscionable:

> [D]eprivation of meaningful choice as to whether to enter into the contract, compulsion to accept terms, opportunity for meaningful negotiation, such gross inequality of bargaining power that negotiations were not possible, characteristics of alleged aggrieved party (underprivileged, uneducated, illiterate, easily taken advantage of), and surprise by fine print or concealed terms.

*Pittard,* ¶ 34, 156 P.3d at 974.

[¶32] Considering first whether the ADR agreement was procedurally unconscionable, we conclude Ms. Boyd has presented no evidence that Ms. Putnam was deprived of meaningful choice as to whether to sign it. There is nothing in the record suggesting Ms. Putnam had any of the characteristics we take into account in determining there was an absence of meaningful choice—Ms. Boyd presented no evidence that Ms. Putnam was underprivileged, uneducated, illiterate, or easily taken advantage of. In fact, Ms. Boyd presented no evidence about Ms. Putnam at all.

[¶33] The evidence does show that Ms. Putnam could not have been surprised by fine print or concealed terms. The agreement expressly stated at the top in bold print that it was optional, which should have alerted Ms. Putnam that she was not compelled to sign it. If she did not understand that, she could have asked. Likewise, she could have asked if she did not understand the effect of signing the document. Ms. Boyd has presented no evidence suggesting Ms. Putman was somehow prevented from asking about the ADR agreement.

[¶34] Ms. Boyd does assert that Ms. Putnam was emotionally distraught at the time she signed the agreement, and that her "grief and confusion placed her at a disad-

vantage." However, the record contains no evidence to support these assertions. Again, it is devoid of any evidence about Ms. Putnam or her state of mind. Absent evidence demonstrating that the ADR agreement was both procedurally and substantively unconscionable, Ms. Boyd's claim that the agreement was unconscionable fails.

### 3. Enforceability of the ADR Agreement in Light of the Provision Incorporating the National Arbitration Forum Mediation Rules and Code of Procedure

[¶35] The ADR agreement included a provision stating that mediation and arbitration between the parties "shall be ... administered by an independent, impartial entity that is regularly engaged in providing mediation and arbitration services." The agreement further provided that the administrator "may be" the National Arbitration Forum (NAF) located in Minneapolis, Minnesota; however, if the parties chose not to use NAF or if NAF was unwilling or unable to serve, the agreement authorized the parties to select another administrator satisfying the qualifications set forth in the agreement. The agreement stated:

> **V. Process.** Regardless of the entity chosen to be Administrator, <u>unless the Parties agree otherwise in writing</u>, the ADR process <u>shall be</u> conducted in accordance with the NAF Mediation Rules and the NAF Code of Procedure ... <u>then in effect</u>.

(Emphasis added).

[¶36] In the district court, Ms. Boyd argued the words "then in effect" indicated that the arbitration rules the parties were required to follow were subject to change, and therefore the parties did not know what rules they were agreeing to, and there was no meeting of the minds as to an essential term of their agreement. She also asserted that Kindred's promise to be bound by a set of rules that were subject to change was not sufficient consideration for a binding contract. Finally, she argued the invalid rule provision went to the very essence of the agreement and was therefore not severable, rendering the entire agreement invalid.

[¶37] Before this Court, Ms. Boyd presents a much different argument. She argues the ADR agreement is unenforceable because it requires any arbitration governed by the agreement to be conducted in accordance with NAF's rules and code of procedure, that NAF is the only entity that can administer those rules and procedure and that NAF has been precluded from serving as administrator in consumer arbitrations since 2009. She further contends the NAF rules and code of procedure are no longer available, leaving the parties unable to comply with the contract requirement even if they select another administrator.

[¶38] Kindred urges the Court not to address Ms. Boyd's new arguments because she did not present them in district court. Although both arguments challenge the enforceability of the ADR agreement, they do so on entirely different grounds. Ms. Boyd's new arguments were not explored in district court and there is no evidentiary basis in the record for her assertions about the NAF or its rules. We therefore decline to address the new arguments and limit our discussion to those Ms. Boyd presented in district court.

[¶39] Mutual assent between contracting parties is necessary for the formation of a contract. *Frost Const. Co. v. Lobo, Inc.*, 951 P.2d 390, 395 (Wyo. 1998) (citing *Raymond v. Steen*, 882 P.2d 852, 856 (Wyo. 1994)). It is not necessary, however, that each term be spelled out in minute detail. *Roussalis*, 4 P.3d at 231-32 (citing *Engle v. First Nat'l Bank of Chugwater*, 590 P.2d 826, 831 (Wyo. 1979)). The parties need only agree upon the essentials of the contract, and those essentials must be ascertainable. *Id.* The law does not favor the destruction of contracts on the ground of indefiniteness; if it is feasible the court will construe the agreement so as to carry into effect the reasonable intention of the parties if such intention can be ascertained. *Id.*

[¶40] Kindred and Ms. Putnam agreed to submit disputes arising from Aletha's care to mediation, and if that was unsuccessful, to arbitration. They further agreed that any mediation and/or arbitration would be administered by an independent, impartial entity regularly engaged in providing mediation and arbitration services. Although the agreement provided that NAF "may be" the administrator, it also expressly stated that the parties were free to select another qualified administrator. While the agreement stated that regardless of the administrator selected, the mediation and arbitration proceedings "shall" be conducted in accordance with NAF rules and code of procedure, it also expressly gave the parties the right to agree in writing to a different process. Because the parties could opt out of proceedings conducted in accordance with NAF rules and agree to a different process, the NAF rules provision was not a condition necessary to performance of the contract and, we conclude, not an essential term. From the express language in the ADR agreement, we can ascertain the reasonable intent of the parties to select a qualified administrator and allow for a non-NAF process. The agreement is not unenforceable for lack of mutual assent.

[¶41] Ms. Boyd also argued that Kindred's promise to be bound by a set of rules that was subject to change was not adequate consideration to support the ADR agreement. She cited *Dumais v. American Golf Corp.*, 299 F.3d 1216 (10th Cir. 2002), to support her contention. There, an employer retained the right to unilaterally change or delete handbook provisions, including arbitration provisions. The court held that an arbitration agreement allowing one party the unfettered right to alter the arbitration agreement's existence or scope was illusory. *Id.* at 1219. That holding has no bearing on the ADR agreement at issue here. Kindred did not retain the right to unilaterally alter the agreement's existence or scope. Instead, the agreement required the parties to submit any disputes to arbitration, choose a qualified administrator, and agree in writing to a different process if they did not intend the proceedings to be conducted in accordance with the NAF rules.

[¶42] For a contract to be valid, "there must be an offer and acceptance along with bargained for and exchanged valuable consideration. Valuable consideration in this context may consist of an exchange of mutual promises, which promises impose a legal lia-

bility upon each promisor." *Carroll v. Bergen*, 2002 WY 166, ¶ 12, 57 P.3d 1209, 1214 (Wyo. 2002) (citing *Kerper v. Kerper*, 780 P.2d 923, 932 (Wyo. 1989)). "Consideration may take a variety of forms including the performance of some act, a forbearance, or the creation, modification, or destruction of a legal relationship." *Schlesinger v. Woodcock*, 2001 WY 120, ¶ 14, 35 P.3d 1232, 1237 (Wyo. 2001).

[¶43] Kindred and Ms. Putnam mutually agreed that any disputes arising from Aletha's care at the facility would be resolved by an ADR process. They further agreed that by entering into the ADR agreement, they were giving up their constitutional right to have disputes decided by a court of law. Additionally, they agreed

> that the speed, efficiency, and cost-effectiveness of the ADR process, together with their mutual undertaking to engage in that process, constitute good and sufficient consideration for the acceptance and enforcement of this Agreement.

Thus, they exchanged mutual promises to forbear their right to resolve disputes in court and create a new legal relationship requiring them to utilize the ADR process. There was sufficient consideration to support the ADR agreement.

[¶44] Other courts have reached the same result when considering whether agreements to arbitrate are supported by sufficient consideration. In *Hayes v. Oakridge Home*, 122 Ohio St.3d 63, 908 N.E.2d 408 (2009), the court held the agreement to arbitrate was supported by sufficient consideration because both parties gave up their right to trial as well as their correlating rights in the judicial process. In *La Frontera Center, Inc. v. United Behavioral Health, Inc.*, 268 F.Supp.3d 1167, 2017 WL 3172723, 2017 U.S.Dist. LEXIS 39477 (D. N.M. 2017), the court held sufficient consideration supported the arbitration agreement, finding the agreement was not subject to unilateral modification or revocation and was not, therefore, illusory. *See also Moberg v. Kindred Healthcare Inc.*, No. 14-CV-0254-F (D. Wyo. 2015) (neither party had the unilateral ability to terminate the ADR agreement, and the agreement of both parties was required to select a different administrator or different rules; therefore, the agreement was not illusory and was supported by adequate consideration); *Specialty Select Care Center of San Antonio, LLC v. Owen*, 499 S.W.3d 37, 44 (Tex. Ct. App. 2016) (mutual agreement to arbitrate claims provides sufficient consideration to support an arbitration agreement).

### CONCLUSION

[¶45] We hold that Ms. Putnam had the authority to sign the optional ADR agreement on Aletha's behalf by virtue of the general durable power of attorney. We further hold that Ms. Boyd failed to show the ADR was unconscionable or that it lacked mutuality of assent or sufficient consideration. The district court's order denying Kindred's motion to compel arbitration is reversed, and we remand with instructions to order arbitration as required by the agreement.